Glenn B. BARNHILL, Plaintiff-Respondent-Cross Petitioner,†

v.

BOARD OF REGENTS OF the UW SYSTEM: Harry P. Sharp, Director, Wisconsin Survey Research Laboratory, UW-Extension, Robert Lee, Field Director, Wisconsin Survey Research Laboratory, UW-Extension, Defendants-Appellants-Petitioners.

Supreme Court

*No. 89–0372. Oral argument October 29, 1991.—Decided February 12, 1992.*

(Also reported in 479 N.W.2d 917.)

†Motion for reconsideration denied on April 21, 1992.

For the defendants-appellants-petitioners the cause was argued by *Robert D. Repasky,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the plaintiff-respondent-cross petitioner there were briefs by *Jacqueline Macaulay* and *Borns, Macaulay & Jacobson,* Madison and oral argument by *Jacqueline Macaulay.*

CALLOW, WILLIAM, G., J. This is a review under sec. (Rule) 809.62, Stats., of a published decision of the court of appeals, *Barnhill v. Board of Regents,* 158

Wis. 2d 278, 462 N.W.2d 249 (Ct. App. 1990). The court of appeals affirmed a decision of the Dane county circuit court, Judge Susan R. Steingass, and held that defendants Sharp and Lee violated Barnhill's First Amendment right of free speech when they terminated Barnhill's employment in retaliation for leaking confidential survey questions to a newspaper during the taking of the survey. However, the court of appeals remanded the case to the circuit court for a new trial on the issue of whether punitive damages were allowable.

Three issues are raised in this review. The first issue concerns whether defendants Sharp and Lee are entitled to qualified immunity as public officials. We hold that Sharp and Lee are entitled to qualified immunity. The case law in 1985 did not clearly establish that Barnhill's interest in disclosing the survey questions outweighed Wisconsin Survey Research Laboratory's (WSRL) confidentiality interest such that a reasonable public official would believe Barnhill's discharge to be an unlawful act.

The second issue is whether Sharp and Lee violated Barnhill's First Amendment[1] right of free speech when they terminated his employment for disclosing confidential survey questions to a newspaper before the survey was complete. We hold that Sharp and Lee did not violate Barnhill's First Amendment rights when they terminated his employment. WSRL's needs for confidentiality and discipline clearly outweigh Barnhill's interest in disclosing the substance of the survey during the course of the survey.

---

[1]The First Amendment of the United States Constitution states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

The third issue concerns the appropriateness of the jury instruction regarding punitive damages. Because of our previous holdings, we do not reach the merits of this issue.

The relevant facts follow and are not in dispute. WSRL is a sub-unit of the University of Wisconsin Extension. The mission of the WSRL is to conduct surveys and field research for the University and non-profit organizations. It generally avoids commercial market research but does research on customer preferences for trade associations and other non-profit organizations. Similar to most privately-owned businesses, the WSRL is funded entirely from fees received from clients requesting survey research.

WSRL has an excellent reputation in the survey industry. The validity of survey research depends upon the confidentiality of the survey questions during the period that the survey is being conducted. A reputation for disclosing the text of survey questions before the survey is completed can seriously harm the reputation and business of a survey research organization.

Harry Sharp is a faculty member of the University of Wisconsin-Madison and has been the director of WSRL since its formation twenty-five years ago. He is primarily responsible for developing the questionnaires used in WSRL research. Robert Lee was the field director for WSRL. His duties included supervision of the interviewers and all of the activities involved in the actual taking or fielding of surveys.

WSRL employs part-time interviewers to conduct its surveys. The interviewers are required to sign and abide by a pledge of confidentiality which provides in relevant part:

> . . . I will maintain professional ethical standards of confidentiality while performing my duties. This

means all information obtained during the course of conducting this research will be held in strict confidence.

Glenn Barnhill was employed by WSRL as a part-time interviewer beginning January 30, 1984. He had no prior experience in survey research. Barnhill signed the pledge of confidentiality described above.

In the fall of 1984, the International Council of Shopping Centers (ICSC), a trade association, contracted with WSRL for a survey of shoppers' attitudes toward group activities and demonstrations in shopping centers. Barnhill attended a pre-test briefing regarding the survey. However, Barnhill left the meeting shortly after it began and expressed his displeasure to the meeting leader that WSRL was conducting a survey on the topic. At the time of the survey, litigation concerning the free speech rights of individuals and groups in shopping malls was pending in Dane county circuit court. *See Jacobs v. Major,* 139 Wis. 2d 492, 407 N.W.2d 832 (1987).[2] The meeting leader told Barnhill that he did not have to participate in the survey and he did not further participate.

On November 27, 1984, Barnhill wrote a letter to Lee explaining his belief that it was inappropriate for WSRL to perform the shopping center survey. In this letter, Barnhill stated:

---

[2]In March 1984, Robert Major and the Nu Parable dancers performed their unique anti-nuclear war dance at the East Towne and West Towne shopping malls in Madison. The mall owners objected, and obtained an injunction against further performances by the dancers. A lawsuit emerged, pitting the dancers' First Amendment right to perform against the mall owners' property interests.

> The question at issue in this study is free speech. This is a right guaranteed in the First Amendment . . ..
>
> The issue is a legal question and will appropriately be decided by the courts. The university should not be lending its name and reputation to one party in this dispute. . . . Clearly a bias has been introduced by our client that may be used in a partisan way that may not be in the public interest.

Lee shared the letter with Sharp, but neither of them responded to it.

On January 23, 1985, Lee received a phone call from a reporter for The Capital Times, a Madison newspaper. The reporter informed Lee that the newspaper possessed the text of the shopping center survey questions. However, The Capital Times did not publish the survey questions at that time. The reporter refused to reveal his source. On that same day, Lee issued a memorandum to WSRL field staff which stated that making interview questions available outside the lab before a project was completed was a violation of the pledge of confidentiality and could seriously damage present and future clients' faith in WSRL's ability to conduct research in a generally accepted professional manner.

Early in the week of January 21, 1985, Barnhill spoke with a Milwaukee Journal reporter and allowed her to examine the survey questions. On January 27, 1985, an article appeared in the Milwaukee Journal paraphrasing some of the questions and quoting both Barnhill and Sharp. This article appeared during the time the survey was in progress.

Sharp ordered the survey interviews stopped after he learned about the Milwaukee Journal article. The survey concluded with 956 useable interviews at a final cost of $11,106.84. WSRL and the ICSC had contracted

for 1,000 interviews at an estimated cost of $14,025.00. Sharp testified that the 956 interviews constituted a sufficient sample and that steps would be taken to ensure the integrity of the survey.

On February 7, 1985, the Daily Cardinal, a University of Wisconsin-Madison student newspaper, published an article which quoted the survey questions and Barnhill's interpretation of certain questions. Lee issued a second memorandum, dated February 11, 1985, reiterating the sentiments expressed in the previous memorandum.

Sometime after the Milwaukee Journal article was published, Sharp and Lee consulted a University attorney about Barnhill's disclosure of the survey questions to the newspaper and what options were available to WSRL as Barnhill's employer. Barnhill performed no work for WSRL after December 16, 1984, and was subsequently discharged from employment with WSRL.

Barnhill sued Sharp, Lee, and the Board of Regents of the University of Wisconsin System under 42 U.S.C. sec. 1983.[3] The jury found that Barnhill was fired sometime before March 26, 1985, and that retaliation for the exercise of his First Amendment rights was a primary factor in his discharge. The circuit court dismissed all claims against the Board of Regents because of absolute

---

[3] 42 U.S.C. sec. 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

immunity. However, the trial court determined that Sharp and Lee were not entitled to qualified immunity. Judgment was subsequently entered against Sharp and Lee in the amount of $27,200.00 for compensatory damages, $25,000.00 for punitive damages, and $30,465.87 for attorneys fees.

A majority of the court of appeals (Sundby, J., dissenting) affirmed the decision of the circuit court that Sharp and Lee were not entitled to qualified immunity and that they violated Barnhill's first amendment right of freedom of speech. The court of appeals, however, remanded the case to the circuit court for a new trial on the allowability of punitive damages. All three issues are before this court for review.

## I. *QUALIFIED IMMUNITY*

The issue of qualified immunity is a question of law that is to be decided by the court, not the jury. *Rakovich v. Wade,* 850 F.2d 1180, 1201 (7th Cir. 1988). This court decides questions of law independently and without deference to the reasoning of the lower courts. *Pulsfus Poultry Farms v. Town of Leeds,* 149 Wis. 2d 797, 803–04, 440 N.W.2d 329 (1989).

Qualified immunity is intended to protect public officials from harassing litigation so that they "reasonably can anticipate when their conduct may give rise to liability for damages." *Davis v. Scherer,* 468 U.S. 183, 195 (1984). More specifically, qualified immunity protects government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800,

818 (1982). Whether a public official may be protected by qualified immunity turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time the action was taken. *Harlow*, 457 U.S. at 818-19. If the law was not clearly established on the subject of the action when it occurred, then the public official cannot be held to know or anticipate that the conduct was unlawful. On the other hand, if the law was clearly established, then the immunity defense should fail because a reasonably competent public official should have known that the conduct was or was not lawful.

Confusion in this area of the law derives from the level of generality that should be afforded to "clearly established law" at the time of the alleged unlawful act. The United States Supreme Court has attempted to provide some guidance in this determination. In *Anderson v. Creighton*, 483 U.S. 635 (1987), the Court explained that:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability

407

> simply by alleging violation of extremely abstract rights. . . . It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.*

*Anderson,* 483 U.S. at 639–40 (citations omitted) (emphasis added). From *Anderson,* we glean several guidelines concerning the level of generality afforded to "clearly established law" in the qualified immunity determination. Merely alleging a general violation of a right that may be clearly established by the constitution or a statute is insufficient clarity of established law to justify withholding qualified immunity. For example, an allegation that an action violates one's freedom of speech protected under the First Amendment is too general to strip a public official of qualified immunity. On the other hand, the "clearly established law" does not have to specifically correspond with every facet of the present situation. Rather, the "clearly established law" must be sufficiently analogous to provide the public official with guidance as to the lawfulness of his or her conduct.

The relevant inquiry is the objective question whether a reasonable public official could have, though mistakenly, believed his actions were lawful in light of the existing law, not whether in hindsight the public official's actions were found to be lawful or unlawful.

*Mitchell v. Forsyth,* 472 U.S. 511, 535 (1985). In this case, we must consider the objective question whether a reasonable public official could have believed that it was lawful in 1985 to discharge Barnhill for disclosing confidential survey questions to a newspaper during the taking of the survey. The lawfulness of discharging an employee on a basis that may infringe on that employee's constitutionally protected interest in freedom of speech necessarily involves a balancing of interests under *Pickering v. Board of Education,* 391 U.S. 563 (1968). Balancing interests to resolve a constitutional question is a particularly difficult task, even for the judiciary. Therefore, whenever a balancing of interests is required to determine if the employee's speech is protected, the facts of the existing case law must closely correspond to the contested action before the public official is subject to liability. *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir. 1986), *cert. denied,* 479 U.S. 848 (1986).

■■

The plaintiff bears the burden of establishing the existence of the allegedly "clearly established" constitutional right. *Davis v. Scherer,* 468 U.S. 183, 197 (1984); *Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir. 1988), *cert. denied,* 488 U.S. 856 (1988). Barnhill cites no cases which are closely analogous or would give a reasonable public official in Sharp and Lee's position notice that their actions violated a constitutional right.

In 1985, there was already a wealth of case law on a public employee's First Amendment right to speak on matters of public concern. It was clearly established that a state may not discharge an employee on a basis that infringed on the employee's constitutionally protected interest in freedom of speech. *See Pickering,* 491 U.S. at 574, and *Perry v. Sindermann,* 408 U.S. 593, 598 (1972)

(a teacher's public criticism of his or her superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of employment); *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (patronage dismissals can be unconstitutional); *Conner,* 847 F.2d at 393 (clearly established in 1982 that a publicly-employed stenographer had a First Amendment right to speak on the use of public funds); and *Donahue v. Staunton,* 471 F.2d 475, 481 (7th Cir. 1972), *cert. denied,* 410 U.S. 955 (1973) (violation of a chaplain's First Amendment rights to fire him for publicly criticizing conditions at a state mental hospital).

However, other cases demonstrate that under certain circumstances a public employer's interest in confidentiality or the effective functioning of the employer's business can outweigh the employee's interest in his or her speech. *See Snepp v. United States,* 444 U.S. 507 (1980); *Egger v. Phillips,* 710 F.2d 292 (7th Cir. 1983), *cert. denied,* 464 U.S. 918 (1984); *Zook v. Brown,* 748 F.2d 1161 (7th Cir. 1984); and *Janusaitis v. Middlebury Volunteer Fire Dep't,* 607 F.2d 17 (2d Cir. 1973). Even the *Pickering* Court recognized that "it is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal." *Pickering,* 391 U.S. at 570 n.3.

*Pickering* and the aforementioned cases suggest that certain factors may be sufficient to limit what a public employee may publicly disclose. These factors include:

410

(1) the need to maintain discipline or harmony among co-workers;

(2) the need for confidentiality;

(3) the manner, time, and place of the employee's speech;

(4) the need to curtail conduct which impedes the employee's proper and competent performance of his daily duties; .

(5) the need to encourage a close and personal relationship between the employee and his superiors, where the relationship calls for loyalty and confidence; and

(6) the context in which the speech occurred.

*Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied,* 411 U.S. 972 (1973); *Connick v. Myers,* 461 U.S. 138, 152–53 (1983).

The factors weighing most heavily in Sharp and Lee's favor are WSRL's need for confidentiality and discipline, and the manner, time, and place of Barnhill's speech. WSRL had a strong interest in maintaining the confidentiality of survey questions during the time the survey was being conducted and deterring other employees from violating the confidentiality rules. Confidentiality of survey questions is necessary to assure valid research results and to protect the reputation of the research organization. A reputation for disclosing survey questions before the survey is completed would have a substantial negative impact on the business of WSRL.

Barnhill's disclosure was a deliberate violation of WSRL's confidentiality rules as set out in the pledge and January 23, 1985 memo. Sharp and Lee had an interest in disciplining Barnhill to deter other employees from

411

violating the confidentiality rules in the future. WSRL cannot effectively function if it is unable to enforce its confidentiality rules.

In *Snepp*, the United States Supreme Court found the need for confidentiality sufficiently important and vital to the operations and reputation of the public employer to outweigh the employee's interest in his speech. The Supreme Court held that an ex-CIA agent's publication of a book about the CIA without the CIA's prior approval was a breach of the agent's fiduciary obligation arising from his employment agreement. *Snepp*, 444 U.S. at 511. Upon employment, the CIA agent signed an employment agreement which included a confidentiality provision. The *Snepp* Court found that the agreement Snepp signed was a reasonable means for protecting the government's vital confidentiality interests. *Id.* at 509 nn.3b, 4b.[4]

Barnhill also signed a pledge of confidentiality when he began working for WSRL. Neither party disputes that this confidentiality is vital to the operations and reputation of WSRL. We do not equate the CIA's need to protect our national security interests with WSRL's need to protect its reputation and business. However, we do recognize that a reasonable public official could conclude that Barnhill's breach of confidentiality was sufficient to permit his discharge.

In relying on *Hanneman v. Breier*, 528 F.2d 750 (7th Cir. 1976), the court of appeals in this case determined that the possession of the survey by The Capital Times diminished WSRL's need for confidentiality when Barnhill talked to the Milwaukee Journal reporter. However, *Hanneman* is inapposite to the present situation. In *Hanneman*, three police officers were under

---

[4]*See also Barnhill*, 158 Wis. 2d at 323-24 (Sundby, J., dissenting).

investigation for an alleged violation of department rules. The investigation was to remain confidential. A newspaper published the existence of the investigation. Subsequently, the officers disseminated letters to public officials complaining that the investigation was driven by anti-union bias. The letters contained no information that was not already contained in the previous newspaper article. The department disciplined the officers for violating its confidentiality rules. The officers brought a sec. 1983 action claiming they were improperly disciplined for exercising their free speech rights.

The *Hanneman* court held that the *Pickering* balance weighed in favor of the employees because the employer's need for confidentiality was greatly diminished by the prior publication in the newspaper. *Hanneman,* 528 F.2d at 754. *Hanneman* differs drastically from the present situation. Here, neither The Capital Times nor any other person or entity had published the survey questions prior to the Milwaukee Journal article. The survey questions were not yet in the public sphere. Therefore, the interests underlying WSRL's confidentiality policy remained firmly intact.

Barnhill argues that the holding in *Conner* should control the decision in this case. In *Conner,* the Seventh Circuit Court of Appeals held that as of May 1982, a reasonable employer would have realized that a retaliatory discharge violates the employee's freedom of speech. *Conner,* 847 F.2d at 393. However, Conner is factually distinguishable and the line of cases relied on by the *Conner* court are inapplicable to the situation presented here. Neither *Conner* nor any of the case law upon which it relied dealt with, as here, confidential information that was not accessible to the general public. *See Conner,* 847 F.2d at 390. In contrast, Barnhill possessed confidential survey questions which were not accessible

to the general public. The validity of survey research depends upon the confidentiality of the survey questions during the taking of the survey. The requirement of confidentiality in the survey industry distinguishes this situation from those addressed in *Conner*. Therefore, *Conner* does not clearly establish a constitutional right in favor of Barnhill.

Barnhill further argues that Sharp and Lee did not believe they were justified in firing Barnhill, given the fact that Sharp and Lee sought legal advice before taking action. However, we do not reach the same conclusion. First, the public officials' subjective state of mind is irrelevant in the qualified immunity determination. *Davis,* 468 U.S. at 191. *Harlow* adopted a wholly objective standard. Whether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of his conduct as measured by reference to "clearly established law." No other circumstances are relevant to the issue of qualified immunity. *Id.* Second, the termination of a public employee should be given serious consideration, especially where constitutional rights are involved. The fact that Sharp and Lee afforded Barnhill this consideration should be encouraged. It is to the employee's benefit rather than his detriment that the public employer seeks legal advice prior to responding to an employee's actions.

We are unconvinced that the law in 1985 clearly established that Barnhill's interests outweighed those of Sharp and Lee, thus, making his discharge unlawful. We can hardly hold Sharp and Lee to higher standards than ourselves. Therefore, we hold that Sharp and Lee are entitled to qualified immunity in this case.

Qualified immunity is an affirmative defense. *Harlow,* 457 U.S. at 815. The entitlement of qualified immunity is immunity from suit rather than a defense to liability. *Mitchell,* 472 U.S. at 526. Thus, it is most appropriately addressed and resolved at the summary judgment stage before extensive measures are taken to defend the public official. Otherwise, the primary benefit of qualified immunity is lost once the case proceeds to trial. The *Mitchell* Court explained:

> [Qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment.

*Id.* (emphasis in original). The Court in *Mitchell* concluded that the question of qualified immunity must be decided at the summary judgment stage, and the trial court's decision on that issue is immediately appealable. *Id.* at 526–27. The *Mitchell* Court then suggests that it is inappropriate for an appellate court on an interlocutory appeal of a summary judgment decision regarding qualified immunity to address the merits of the plaintiff's claim.

> [I]t follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have

415

been violated. . . . An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

*Id.* at 527–28 (citation omitted).

However, where the lower courts have made findings of fact and conclusions of law on the merits, an extant issue of qualified immunity does not deprive this court of jurisdiction to review the merits. Rather, this court in its lawmaking function can and should address the merits in such instances especially where, as here, the court of appeals decision is published and is not an accurate reflection of existing law.

In this case, the issue of qualified immunity was not appealed at the summary judgment stage. The circuit court proceeded to address the merits of the plaintiff's First Amendment claim and a jury concluded that Sharp and Lee violated Barnhill's First Amendment rights when they terminated his employment. In a published decision, the court of appeals affirmed the decisions of the circuit court. Where litigation should be disposed of at summary judgment but the circuit court proceeds to decide the merits of subsequent issues in the case and

416

the court of appeals publishes a decision on the merits of those issues, it is entirely appropriate for this court in its lawmaking function to address the merits of those issues.

## II. *FREEDOM OF SPEECH*

██ The balancing of interests under *Pickering* is a question of law for this court to decide independent of the decisions by the lower courts. *Rankin v. McPherson,* 483 U.S. 378, 386 (1987). The court of appeals correctly sets forth the multi-step analysis required when a public employee such as Barnhill claims to have been impermissibly disciplined for exercising his freedom of speech. This multi-step process was aptly explained in *Melton v. City of Oklahoma City,* 879 F.2d 706 (10th Cir. 1989):

> First, the court must determine whether a public employee's speech touches upon a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 103 S. Ct. 1684. Second, if the statement satisfies the public concern inquiry, the court must then balance the interests of the employee in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public. *Pickering v. Board of Educ.* 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, 20 L. Ed. 2d 811 (1968). Third, assuming that both previous elements have been found in favor of the plaintiff, he or she must then prove that the protected speech "was a 'motivating factor' in the detrimental employment decision." *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977). Fourth and finally, if plaintiff makes this showing, the burden then shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity. *Id.* . . . [T]he first two steps of the process

417

> involve questions of law for the court, the two-part *Mt. Healthy* analysis involves questions of fact for the jury. *Koch v. City of Hutchinson,* 847 F.2d 1436, 1440 n.11 (10th Cir.) (en banc) *cert. denied,* — U.S. —, 109 S. Ct. 262, 102 L. Ed. 2d 250 (1988).

*Melton,* 879 F.2d at 713. Neither party disputes that Barnhill's disclosure constituted speech on a matter of public concern. Thus, for purposes of our analysis, we shall assume, without addressing it, that his disclosure constituted speech on a matter of public concern. The focus of our analysis, then, will be a balancing of interests under *Pickering.*

Barnhill's First Amendment interest stemmed from his concern that a public university was conducting research for an organization that was an interested party in pending First Amendment litigation. The court of appeals summarized Barnhill's conduct as intending "to expose what he perceived as university action favoring business at the expense of the [F]irst [A]mendment." *Barnhill,* 158 Wis. 2d at 302. However, Barnhill's conduct went far beyond just publicly expressing his concerns. He publicly disclosed the text of survey questions before the survey was completed in an attempt to destroy the shopping mall survey and frustrate the operations of WSRL.

The factor weighing most heavily in Sharp and Lee's favor is WSRL's need for confidentiality.[5] WSRL

---

[5]Barnhill argues, and the court of appeals concluded, that WSRL did not sufficiently protect its confidentiality interest because it did not effectively communicate the rule that survey questions were confidential. *Barnhill,* 158 Wis. 2d at 299. This conclusion is unreasonable in light of the language in the pledge of confidentiality and the memo circulated by Lee.

First, upon employment with WSRL, Barnhill signed a pledge of confidentiality that expressly stated, "all information

is a survey research organization. It is funded entirely by monies received from its clients for services rendered. In this sense, WSRL is no different than any other private business enterprise. Its profitability and existence are dependent upon its reputation for conducting research in a generally accepted professional manner. If WSRL developed a reputation for disclosing survey questions prior to the completion of the survey, present and future clients would lose faith in WSRL's ability to function in a generally accepted professional manner. The clients would go elsewhere and WSRL's existence would quickly be threatened.

obtained during the course of conducting this research will be held in strict confidence." A reasonable individual would understand "all information" to necessarily include not only the survey results, but the survey questions as well. The information compiled during the course of a survey would be meaningless without the survey questions.

Second, Lee's January 23, 1985 memo to WSRL field staff would have erased any doubt about WSRL's confidentiality policy. The memo stated in part:

> A very serious violation of confidentiality has occurred at the Lab. A reporter for the *Capitol Times* (sic) has obtained a copy of the interview schedule for a project currently in the field. The reporter informed us the copy came from a member of the WSRL staff but did not identify the individual.

> It has always been Lab policy to make public the schedule of interview questions *only after* a project has been taken from the field. . . .

> The person or persons involved in making the schedule available outside the Lab have violated the oath of confidentiality they are committed to as a Lab employee.

> This act may cause very serious damage to the Lab itself. Our credibility as a viable survey research organization is predicated on our ability to maintain confidentiality at all stages of a project.

All employees of WSRL, including Barnhill, should have understood its confidentiality policy.

■■■
Courts have consistently emphasized that the public employer must show actual, material and substantial harm to its operations as a result of the employee's speech. *See Rankin v. McPherson,* 483 U.S. 378, 388–89 (1987), and *Conner v. Reinhard,* 847 F.2d 384, 391 (7th Cir.), *cert. denied,* 477 U.S. 856 (1988). However, we do not believe that this is limited to present or short-term impairment of worker harmony or employee performance. Rather, the public employer may justify discharging an employee by showing, as it did here, that the employee's speech will have a substantial and detrimental impact on its long-term operations and viability. Such an impact cannot be merely speculative, but must have an actual, material, and substantial basis. In this case, the nature of WSRL's business and its need for confidentiality form a significant basis for us to conclude that conduct such as that undertaken by Barnhill has a substantial and detrimental impact on WSRL's operations.

An additional factor that weighs heavily in Sharp and Lee's favor is WSRL's need for discipline. WSRL has a strong interest in maintaining employee discipline and deterring other employees from violating its confidentiality rules. Barnhill's disclosure of the survey questions during the survey was a deliberate violation of WSRL's confidentiality rules. WSRL cannot function effectively if it is unable to enforce its confidentiality rules.

■■■
The circuit court in this case failed to undertake a balancing analysis and merely adopted the jury's finding that Barnhill's interests outweighed those of WSRL. The circuit court erred by leaving the balancing of interests under *Pickering* to the jury. The balancing of inter-

ests under *Pickering* is a question of law which is to be decided by the court, not the jury. *Wren v. Spurlock,* 798 F.2d 1313, 1317–18 (10th Cir. 1986). The court of appeals reviewed the record independently and affirmed the decision of the circuit court. The court of appeals acknowledged WSRL's need for confidentiality, but stated three reasons to support its conclusion that Barnhill's interests outweighed those of WSRL. We disagree.

First, relying on *Hanneman,* the court of appeals determined that WSRL's need for confidentiality was diminished by the fact that the survey questions had previously been given to The Capital Times. *Barnhill,* 158 Wis. 2d at 301–02. As discussed earlier, *Hanneman* differs drastically from the present situation. Prior publication was the crucial element in the *Hanneman* decision. Here, even though The Capital Times possessed the survey questions, it did not publish them prior to the Milwaukee Journal article. WSRL's need for confidentiality was not diminished by possession of the survey questions by The Capital Times.

Second, the court of appeals stressed the political nature of Barnhill's disclosure about the relationship between a public university and a private business. *Barnhill,* 158 Wis. 2d at 302. However, the record clearly indicates that Sharp and Lee discharged Barnhill for disclosing the survey questions during the taking of the survey, not for his criticism of WSRL's involvement in the survey. Barnhill could have expressed his concerns without deliberately trying to damage and impair the operations, reputation, and business of WSRL.

Third, and finally, the court of appeals determined that Barnhill's conduct "did little more than inconvenience and embarrass the employer." *Id.* at 298. This determination completely ignores a fact that the court of appeals readily recognized—namely, that the validity of

421

survey research depends upon the confidentiality of the survey questions during the conducting of a survey. A reputation for disclosing survey questions before the survey is completed can seriously harm the reputation and business of a survey research organization. Barnhill's conduct did much more than inconvenience and embarrass WSRL. His conduct reflects directly upon WSRL's viability and profitability as a survey research organization.

After considering all of the relevant *Pickering* factors, we conclude that WSRL's needs for confidentiality and discipline clearly outweigh Barnhill's interest in disclosing the survey questions during the course of the survey. Therefore, Sharp and Lee did not violate Barnhill's First Amendment right of free speech when they terminated his employment.

Because of our holdings on the two previous issues, we need not reach the punitive damages issue.

*By the Court.*—The decision of the court of appeals is reversed and the case is remanded to the circuit court for dismissal.

Justice Shirley S. ABRAHAMSON took no part in this matter.