KARA B., by Guardian ad Litem, John C. Albert, Steven B. and Jennifer B., parents of Kara B., Plaintiffs-Appellants,

v.

DANE COUNTY, Dane County Department of Human Services, its agents and assigns, Shirley Aasen, Ed Page, Jr., Margaret/Marjorie Johnson, Estate of Margaret E. Eby, Terri Collins, Virginia Hanson and Wisconsin Municipal Mutual Insurance Company, Defendants-Respondents-Petitioners,

Sue MARSHALL and Roxanne Smit, Defendants.

MIKAELA R., a minor, by Guardian ad Litem, John C. Albert and Joette R., parent of Mikaela R., Plaintiffs-Respondents,

v.

DANE COUNTY, Dane County Department of Human Services, its agents and assigns, Shirley Aasen, Ed Page Jr., Margaret/Marjorie Johnson, Estate of Margaret E. Eby, Sue Marshall, Terri Collins, Virginia Hanson, Robert Syring and Wisconsin Municipal Mutual Insurance Company, Defendants-Appellants-Petitioners, †

Roxanne SMIT, Defendant,

SENTRY INSURANCE COMPANY, Defendant-Appellant.

Supreme Court

†Motion for reconsideration denied January 21, 1997.

140

*Nos. 94–1081, 94–2908. Oral argument September 4, 1996.—Decided November 25, 1996.*

(Also reported in 555 N.W.2d 630.)

For the defendants-respondents-appellants-petitioners there were briefs by *John M. Moore, David J. Pliner* and *Bell, Metzner, Gierhart & Moore, S.C.*, Madison and oral argument by *David J. Pliner*.

For the plaintiffs-appellants-respondents there was a brief by *Debra A. Petkovsek, John C. Albert* and *Eustice, Albert, Laffey & Fumelle, S.C.*, Sun Prairie and oral argument by *Debra A. Petkovsek*.

JON P. WILCOX, J.   This case is before the court on a petition for review filed by Dane County, the Dane County Department of Human Services, its agents and assigns, and Wisconsin Municipal Mutual Insurance Company (collectively "Dane County"). The petitioners seek review of a published decision of the court of appeals, *Kara B. v. Dane County*, 198 Wis. 2d 24, 542 N.W.2d 777 (Ct. App. 1995), reversing in part and affirming in part two circuit court judgments. We affirm the decision of the court of appeals.

On review, there are three issues: (1) whether the Dane County public officials are entitled to qualified immunity from the plaintiffs' 42 U.S.C. § 1983 claims; (2) whether the scope of the constitutional duty to

provide a foster child with safe and secure placement is measured by a deliberate indifference or professional judgment standard; and (3) whether Dane County is entitled to summary judgment because the Dane County public officials did not act with deliberate indifference as a matter of law. We hold that the Dane County public officials are not entitled to qualified immunity, that the constitutional duty owed to foster children is based on a professional judgment standard, and that Dane County is not entitled to summary judgment.

The relevant facts are not in dispute. In 1989 and 1990, Kara B. and Mikaela R. were adjudged to be children in need of protection or services in separate juvenile court proceedings, and were placed in the temporary custody of the Dane County Department of Social Services for foster home placement. Kara B., a seven year old girl, was placed in a licensed foster home operated by Roxanne Smit on March 28, 1989, and remained there until July 14, 1990. Mikaela R., an eleven year old girl, was placed in the Smit home on June 11, 1990. She remained there until December 18, 1990, when she fled after being sexually assaulted at knifepoint by two men in the basement of the home. The men were known to have a history of physically and sexually abusing children. In the course of investigating the assault, police contacted Kara B., who told them that she too had been sexually abused by Smit and by a man who had lived in the foster home during the course of her stay there.

In separate actions brought under 42 U.S.C. § 1983 and state-law negligence and professional malpractice claims, Kara B. and Mikaela R. sued Dane County for damages resulting from physical and sexual abuse that occurred during their separate stays in the

Smit foster home. In the case brought by Kara B., the circuit court, Judge Mark A. Frankel, granted Dane County's motion for summary judgment dismissing the § 1983 claims. The court concluded that the Dane County public officials were entitled to qualified immunity because Kara B. had not shown that the public officials had violated a clearly established constitutional right. In Mikaela R.'s case, a second circuit court, Judge Gerald C. Nichol, denied Dane County's motion for summary judgment. This decision was based on the circuit court's determination that the Dane County public officials were not entitled to qualified immunity because they had a clearly established constitutional duty to protect Mikaela R. while she was in the Smit home, and that a reasonable jury could have found that the Dane County public officials had violated that duty.

The court of appeals held that: (1) the Dane County public officials were not entitled to qualified immunity from the 42 U.S.C. § 1983 claims brought by Kara B. and Mikaela R. because the public officials were accused of violating a clearly established right, (2) the public officials' conduct should be assessed based on a professional judgment standard, and (3) Dane County was not entitled to summary judgment. Dane County petitioned for review and we granted the petition on January 16, 1996.

I.

The first issue that we address is whether the Dane County public officials are entitled to qualified immunity. The issue of qualified immunity is a question of law to be decided by the court. This court decides questions of law independently and without

deference to the lower courts. *Barnhill v. Board of Regents*, 166 Wis. 2d 395, 406, 479 N.W.2d 917 (1992).

The doctrine of qualified immunity protects public officials from civil liability if their conduct does not violate a person's clearly established constitutional or statutory right. *Barnhill*, 166 Wis. 2d at 406-07. Qualified immunity is designed to allow public officials to perform their duties without being hampered by the expense or threat of litigation. *See Burkes v. Klauser*, 185 Wis. 2d 308, 325-27, 517 N.W.2d 503 (1994), *cert. denied*, __U.S.__, 115 S.Ct. 1102 (1995), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 814 (1982). In *Harlow*, the Supreme Court explained the importance of qualified immunity:

> [I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties."

*Harlow*, 457 U.S. at 814 (citations omitted). In *Davis v. Scherer*, 468 U.S. 183 (1984), the Supreme Court further elaborated on the goal of qualified immunity: "[t]he qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Id.* at 195. Although qualified immunity plays a crucial role

146

in allowing our government and its public officials to function effectively and efficiently, it is not absolute.

Qualified immunity does not protect public officials who have allegedly violated someone's clearly established constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (*Harlow*, 457 U.S. at 819); *Burkes*, 185 Wis. 2d at 326 (citation omitted). This, in part, stems from the fact that officials may reasonably anticipate that violation of a clearly established constitutional right will give rise to liability. As the Supreme Court stated in *Harlow*, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19. The parties dispute whether the constitutional right of foster children to safe and secure placement in a foster home was clearly established in 1989. Thus, we must determine whether the constitutional right in question was clearly established to decide whether the Dane County public officials are entitled to qualified immunity.

Such a determination is not as easily reached as might be expected. As was noted by this court in *Barnhill*, "[c]onfusion in this area of law derives from the level of generality that should be afforded to 'clearly established law' at the time of the alleged unlawful act." *Barnhill*, 166 Wis. 2d at 407. The United States Supreme Court attempted to clarify the meaning of clearly established constitutional right in *Anderson*, 483 U.S. 635. In that case, the Court stated:

> The contours of the right must be sufficiently clear
> that a reasonable official would understand that

147

what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. . .but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640 (citations omitted).[1]

In *Burkes*, this court considered what constitutes a clearly established constitutional right for purposes of qualified immunity. This court stated:

Government officials are not protected from suit for civil damages (that is, they do not have the defense of qualified immunity) when at the time they acted they knew or should have known that the action would deprive the employee of a constitutional right. The relevant inquiry, then, is whether a reasonable state official could have believed his or her act was constitutional "in light of clearly established law and the information [he or she] possessed" at the time of the official's action.

---

[1] In *Barnhill*, this court adopted the interpretation set forth in *Anderson*:

From *Anderson*, we glean several guidelines concerning the level of generality afforded to 'clearly established law' in the qualified immunity determination. Merely alleging a general violation of a right that may be clearly established by the constitution or a statute is insufficient clarity of established law to justify withholding qualified immunity. For example, an allegation that an action violates one's freedom of speech protected under the First Amendment is too general to strip a public official of qualified immunity. On the other hand, the 'clearly established law' does not have to specifically correspond with every facet of the present situation. Rather, the 'clearly established law' must be sufficiently analogous to provide the public official with guidance as to the lawfulness of his or her conduct.

*Barnhill*, 166 Wis. 2d at 407-08.

*Id.* at 326, quoting *Anderson*, 483 U.S. at 641 (footnote omitted). This court also specified what case law is relevant in making such a determination:

> In determining whether it was objectively legally reasonable for public officials to conclude that a particular decision was lawful, we must examine the information they possessed in light of the established case law at the time. In this case, the question is whether, in June 1989, the defendants knew or should have known that a decision to discharge the plaintiff. . .would be unlawful.

*Id.* at 326-27 (citation omitted). Consequently, we must determine whether, in March 1989, existing case law had clearly established a constitutional right for a foster child to be placed in a safe and secure foster home to such an extent that a reasonable public official would have been put on notice that violation of such a right could lead to liability.

The examination begins with *Estelle v. Gamble*, 429 U.S. 97 (1976). In *Estelle*, the Supreme Court considered whether various prison officials had subjected a prisoner to cruel and unusual punishment in violation of the Eight Amendment by inadequately treating his injuries. The Court held that deliberate indifference to a prisoner's serious illness or injury constitutes cruel and unusual punishment. In reaching this decision, the Court stated: "[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." *Id.* at 104, quoting *Spicer v. Williamson*, 132 S.E. 291, 293 (1926) (bracketed material in *Estelle* and footnote omitted). This case established that the state owes a constitutional duty to prisoners arising from the fact that prisoners are in the state's custody.

The extension of this duty to foster children was first alluded to in *Doe v. New York City Dep't of Social Services*, 649 F.2d 134 (2nd Cir. 1981), *cert. denied*, 464 U.S. 864 (1983) (*Doe*). In that case, a foster child brought a § 1983 action against the state placement agency for failing to supervise her placement adequately. In finding that the trial court had erroneously instructed the jury, the Second Circuit cited *Estelle* for the proposition that "[g]overnment officials may be held liable under § 1983 for a failure to do what is required as well as for overt activity which is unlawful and harmful." *Id.* at 141 (citations omitted).

In 1982, the Supreme Court extended the state's duty to involuntarily committed mental patients. *Youngberg v. Romeo*, 457 U.S. 307 (1982). The *Youngberg* Court held that a committed individual had constitutionally protected liberty interests under the Due Process Clause of the Fourteenth Amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably might be required by these interests. The reasoning used by the Court in reaching its decision suggests that foster children should be entitled to a similar constitutional right.

First, the Court reasoned that the protection afforded to prisoners should logically be afforded to those who are not in the state's custody for the purpose of punishment: "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Id.* at 315-16. Additionally, the Court stressed that the state's duty arose because the individual was in the state's custody: "[w]hen a person

is institutionalized—and wholly dependent on the State—it is conceded by petitioners that a duty to provide certain services and care does exist." *Id.* at 317. This reasoning strongly supports the extension of a constitutional right to foster children.

The Eleventh Circuit recognized such an extension of *Youngberg* in *Taylor by and through Walker v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987), *cert. denied*, 489 U.S. 1065. The *Taylor* court held that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." *Taylor*, 818 F.2d at 797 (footnote omitted). In so holding, the *Taylor* court relied on the reasoning of *Youngberg*:

> The liberty interest in this case is analogous to the liberty interest in *Youngberg*. In both cases, the state involuntarily placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements.

*Id.* at 795. The Eleventh Circuit also noted that the vulnerability of children was compelling:

> With contemporary society's outrage at the exposure of defenseless children to gross mistreatment and abuse, it is time that the law give to these defenseless children at least the same protection afforded adults who are imprisoned as a result of their own misdeeds.

*Id.* at 797. The *Taylor* court concluded that "[t]he relationship between state officials charged with carrying out a foster child care program and the children in the program is an important one involving

151

substantial duties and, therefore, substantial rights."
*Id.* at 798. Accordingly, this case supplied social
workers with a direct application of the holding in
*Youngberg* to the foster care setting.

Although we do not believe it impossible, or even
improbable, that a reasonable social worker would
have been aware of the natural application of
*Youngberg* to foster children, we do not believe that
prior to *DeShaney v. Winnebago County Dep't of Social
Services*, 489 U.S. 189 (1989), the constitutional right
to reasonably safe and secure placement in a foster
home had reached the level of clearly established. We
also do not believe that *DeShaney*, if viewed in isolation
from the cases that preceded it, is sufficient to clearly
establish such a constitutional right. However, when
*Estelle*, *Youngberg*, *Taylor*, *Doe*, and *DeShaney* are
read together, a constitutional right is clearly
established.

In *DeShaney*, the mother of a child who had been
beaten brought a § 1983 action against social workers
and local officials who, although having received
complaints that the boy was being abused by the
father, had not removed him from the father's custody.
The Supreme Court held that the state does not owe a
duty to protect a child who was abused by his natural
father. The reasoning employed by the Court to reach
this decision clearly illustrates that foster children do
have constitutional rights under the Due Process
Clause. The Court based its holding on the fact that the
state's duty only arises when it takes a person into its
custody and so deprives that person of the ability to
care for himself:

> Taken together [*Youngberg* and *Estelle*] stand only
> for the proposition that when the State takes a

152

person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.. . .The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g. food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 199-200 (citations omitted). When this reasoning is examined in the context of *Estelle, Youngberg, Taylor*, and *Doe*, it is apparent that the *DeShaney* decision completed the clear establishment of a constitutional right to safe and secure placement in a foster home. There can be no doubt that the explicit holding of *DeShaney*—that the state assumes responsibility for an individual's safety when that individual is taken into custody by the state—provided public officials with adequate notice.

The *DeShaney* Court also made specific reference to foster homes:

Had the State by affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed several Courts of Appeals have held, by analogy to *Estelle* and *Youngberg*, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents. We express no view on the

153

validity of this analogy, however, as it is not before us in the present case.

*Id.* at 201 n.9 (citations omitted). This footnote, although not determinative on its own, illustrates that the Court considered the effect of its holding on the rights of foster children. The footnote should have also served as a warning to social workers that they should carefully examine the holding of *DeShaney*. If the Dane County public officials had considered the holding of *DeShaney* and the trend established by *Estelle*, *Youngberg*, *Taylor*, and *Doe* when they took Kara B. and Mikaela R. into custody, they would have certainly expected to assume some responsibility for their safety.

Dane County points out that the *DeShaney* Court did not directly confront the application of the state's duty to those in its custody to the foster home setting.[2] We do not discount this fact; however, it was not necessary for the circuit court to directly consider the issue to clearly establish a constitutional right. *See Anderson*, 483 U.S. at 640 ("This is not to say that an

---

[2] Another argument that could be made, but was not raised, is that even though *DeShaney* completed the establishment of a clear constitutional right, the one month between the *DeShaney* decision and the placement of Kara B. in the Smit home was not a sufficient period for a reasonable public official to acquire notice. The relevant date for determining if a clearly established constitutional right existed is the date on which the foster child left the foster home. A social worker's duty does not end when a child is placed in a foster home. If this were the case, a child could be left in an abusive foster home for years without hope of rescue. Thus, the insufficient notice argument must fail as Kara B. spent almost sixteen months in the Smit home. Certainly, more than seventeen months need not elapse before a reasonable public official would have notice of the holding of a case affecting his liability.

official action is protected by qualified immunity unless the very action in question has previously been held unlawful. . . .").[3]

In addition to arguing that *DeShaney* does not clearly establish a constitutional right, Dane County asserts that *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir. 1989), *cert. denied*, 495 U.S. 956 (1990), would have led a reasonable public official to believe that no constitutional right to safe and secure placement in a foster home existed in 1989.[4] Although the *Bobbitt* case

---

[3] The Seventh Circuit addressed the issue of what constitutes a clearly established constitutional right in *K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990):

> It begins to seem as if to survive a motion to dismiss a suit on grounds of immunity the plaintiff must be able to point to a previous case that differs only trivially from his case. But this cannot be right. The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

*Id.* at 851.

[4] In support of this contention, Dane County relies on two passages from *Bobbitt*. The first relates to the *DeShaney* decision:

> The issue in the present case is whether in 1984 an official violated a clearly established constitutional right by placing a child in an environment despite information that individuals in that environment might present a threat to the child's safety. It is conceded that in 1984 there was no Supreme Court decision on this issue. In fact even at present the Supreme Court has not confronted the question.

*Id.* at 511, citing *DeShaney*, 489 U.S. 189. The second passage addresses the *Doe* case:

> In the present case, we are unable to conclude that in early 1984 a substantial consensus had been reached that placing a child in a potentially dangerous environment in a foster home was a

155

does not strengthen the clear establishment of a constitutional right by *DeShaney*, *Youngberg*, *Estelle*, *Doe*, and *Taylor*, it also does not destroy it.

The *Bobbitt* court was called on to determine whether foster children had a clearly established constitutional right in 1984; the issue in this case is whether such a right was clearly established in 1989. In addition to determining that the right at issue was not clearly established in 1984, the *Bobbitt* court asserted that the Supreme Court had "not yet confronted the issue," *Bobbitt*, 881 F.2d at 511, citing *DeShaney*, 489 U.S. 189, and that the analogy between foster children and involuntarily committed mental patients had not yet been "endorsed by either the Supreme Court or the Seventh Circuit." *Id.* at 512. This argument is unpersuasive as neither the Supreme Court nor the Seventh Circuit needed to directly confront the specific issue to clearly establish a constitutional right. *See Anderson*, 483 U.S. at 640; *K.H.* 914 F.2d at 851. As discussed earlier, the accepted standard is based on whether existing case law is sufficiently analogous to provide a reasonable public

---

violation of the due process clause. At that time, only the Second Circuit had held that such a right existed and that case was not directly on point since it involved placement in a licensed foster home on a permanent basis. See *Doe v. New York City Department of Social Services*, 649 F.2d 134 (2nd Cir. 1981). Moreover, the decision in *Doe* depended upon an absolutely novel analogy between incarceration and placement in a foster home, an analogy that has yet to be endorsed either by the Supreme Court or the Seventh Circuit. In view of the novelty and the paucity of the available authority, we cannot agree with the district court that it was clearly established in 1984 that a public official who places a child at risk of harm from private individuals in a foster home violated that child's constitutional rights.

*Id.* at 511-12 (footnote omitted).

official with notice that he or she will be subjected to liability.

Dane County also relies on the *Bobbitt* court's statement that the facts of *Doe* could be distinguished and that "the decision in *Doe* depended upon an absolutely novel analogy between incarceration and placement in a foster home. . . ." *Doe*, at 512. It is true that *Doe* was a novel decision and that its facts are not exactly parallel to the facts of either *Bobbitt* or this case. However, *Doe* is merely part of a trend that led to the clear establishment of the right in *DeShaney*.

The impact of *Bobbitt* is further weakened by the Seventh Circuit's decision in *K.H.* In *K.H.*, the court was called on to determine whether foster children had a clearly established right in 1986. The Seventh Circuit stated that its own decision in *Bobbitt* was limited to cases in which the child was placed with a relative. *K.H.*, 914 F.2d at 852-53. The court further held that *Youngberg*, which was decided in 1982, had clearly established a constitutional right for foster children:

> *Youngberg v. Romeo* made clear, years before the defendants in this case placed K.H. with an abusing foster parent in 1986, that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically.

*Id.* at 851. Although this case was decided too late to have a direct effect on the determination of whether a clearly established constitutional right existed when Kara B. and Mikaela R. were in the Smit foster home, the Seventh Circuit's holding that such a right existed in 1982 is of persuasive value. However, unlike the *K.H.* court, we do not rely on *Youngberg* alone.

In sum, we believe that the trend beginning with *Estelle* and ending with *DeShaney* created a clearly established right. The first significant steps toward establishing this right were taken by the Supreme Court in *Estelle* and *Youngberg*. The *Doe* court then recognized a constitutional right of foster children. The *Taylor* court moved the right closer to being clearly established by the explicit extension of the *Youngberg* reasoning to foster children. The Supreme Court provided the final link in *DeShaney*. Accordingly, we conclude that Kara B. and Mikaela R. had a clearly established constitutional right under the Due Process Clause to safe and secure placement in a foster home.

## II.

The next issue that we address is the appropriate scope of the public officials' constitutionally imposed duty to place foster children in a safe and secure environment. Constitutional issues are questions of law that this court reviews without deference to the holdings of the lower courts. *Ball v. District No. 4 Area Bd.*, 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).

Dane County argues that a deliberate indifference standard should be used to evaluate whether the foster children's rights were violated. The plaintiffs assert that a professional judgment standard is appropriate. We hold that those entrusted with the task of ensuring that children are placed in a safe and secure foster home owe a constitutional duty that is determined by a professional judgment standard.

It is undisputed that a deliberate indifference standard is imposed on public officials for claims brought by prisoners based on the Eighth Amendment.

*Estelle*, 429 U.S. 97; *Farmer v. Brennan*, 511 U.S. 825 (1994). Under this standard, liability is imposed when public officials exhibit deliberate indifference to a risk to the prisoner that was actually known to them. *Farmer*, 511 U.S. at __, 114 S.Ct. at 1979. Both the *Doe* and *Taylor* courts applied this subjective standard in the foster care setting. *See Doe*, 649 F.2d at 145; *Taylor*, 881 F.2d at 796-97. However, in *Youngberg*, the Supreme Court asserted that the professional judgment standard is appropriate for public officials charged with the care of institutionalized mentally retarded individuals.

The *Youngberg* Court defined the professional judgment standard as follows:

> [T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Youngberg*, 457 U.S. at 323. The Court reasoned that this standard was appropriate because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22 (citation omitted).

The same factors that led the *Youngberg* Court to apply a professional judgment standard rather than a deliberate indifference standard are present in this case. As the Tenth Circuit noted:

> The compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are

"entitled to more considerate treatment and conditions" than criminals. *Youngberg*, 457 U.S. at 321-22, 102 S.Ct. at 2461-62. These are young children, taken by the state from their parents for reasons that generally are not the fault of the children themselves. The officials who place the children are acting in the place of the parents.

*Yvonne L. v. New Mexico Dep't of Human Services*, 959 F.2d 883, 894 (10th Cir. 1992).[5]

■

We agree that *Youngberg* is more closely analogous to claims involving foster children than *Estelle*. We also find compelling the argument that foster children should be entitled to greater rights than prisoners. Accordingly, we conclude that the duty of public officials to provide foster children with a safe and secure placement is based on a professional judgment standard.

As we conclude that the professional judgment standard should be applied, we need not address whether Dane County did not act with deliberate indifference as a matter of law.

---

[5] The Seventh Circuit has also adopted the professional judgment standard for claims by foster children. *K.H. v. Morgan*, 914 F.2d 846, 854 (7th Cir. 1990). ("Even when resources are not severely limited, child welfare workers and their supervisors have a secure haven from liability when they exercise a bona fide professional judgment as to where to place children in their custody. Only if without justification based either on financial constraints or on considerations of professional judgment they place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability in damages." *Id.*)

*By the Court.*—The decision of the court of appeals is affirmed.