KARA B., By Guardian Ad Litem, John C. Albert, Steven B., and Jennifer B., Parents of Kara B., Plaintiffs-Appellants,

v.

DANE COUNTY, Dane County Department of Human Services, Its Agents and Assigns, Shirley Aasen, Ed Page, Jr., Margaret/Marjorie Johnson, Estate of Margaret E. Eby, Terri Collins, Virginia Hanson, Wisconsin Municipal Mutual Insurance Company, Defendants-Respondents,†

Sue MARSHALL, Roxanne Smit, Defendants, [Case No. 94-1081]

MIKAELA R., a Minor, By Guardian Ad Litem John C. Albert and Joette R., Parent of Mikaela R., Plaintiffs-Respondents,

v.

DANE COUNTY, Dane County Department of Human Services, Its Agents and Assigns, Shirley Aasen, Ed Page Jr., Margaret/Marjorie Johnson, Estate of Margaret E. Eby, Sue Marshall, Terri Collins, Virginia Hanson, Robert Syring and Wisconsin Municipal Mutual Insurance Company, Defendants-Appellants,†

Roxanne SMIT, Defendant,

SENTRY INSURANCE COMPANY, Defendant-Appellant. [Case No. 94-2908]

---

†Petition to review granted.

24

Court of Appeals

*Nos. 94–1081, 94–2908. Submitted on briefs July 10, 1995.—Decided November 2, 1995.*

(Also reported in 542 N.W.2d 777.)

For the plaintiffs-appellants the cause was submitted on the briefs of *John C. Albert* and *Debra A. Petkovsek* of *Eustice, Albert, Laffey & Fumelle, S.C.,* of Sun Prairie.

For the defendants-appellants the cause was submitted on the briefs of *John M. Moore* and *David J. Pliner* of *Bell, Metzner, Gierhart & Moore, S.C.,* of Madison.

For the defendants-respondents the cause was submitted on the briefs of *John M. Moore* and *David J. Pliner* of *Bell, Metzner, Gierhart & Moore, S.C.,* of Madison.

For the plaintiffs-respondents, the cause was submitted on the briefs of *John C. Albert* and *Debra A. Petkovsek* of *Eustice, Albert, Laffey & Fumelle, S.C.,* of Sun Prairie.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. We consolidated these two cases on appeal. They are actions, brought under 42 U.S.C.

§ 1983 and state-law negligence and professional malpractice theories, seeking damages for physical and sexual abuse suffered by two young children while living in a foster home.

## I. Background

Kara B. and Mikaela R. were adjudged to be children in need of protection or services in separate juvenile court proceedings in 1989 and 1990, and were placed in the temporary custody of the Dane County Department of Social Services for foster-home placement. Kara B. was placed in a licensed foster home operated by Roxanne Smit on March 28, 1989, and remained there until July 14, 1990. Mikaela R. was placed in the Smit home in June 1990 and remained until December 18, 1990, when she was sexually assaulted at knifepoint by two men in the basement of the home. In the course of investigating the assault, police contacted Kara B., who told them that she too had been sexually abused by Smit and by a man who had lived in Smit's house during the course of her placement there.

In separate actions, the children sued the department and several of its professional employees who had been involved in either their initial placement or in relicensing and monitoring the home while they were in residence. Smit also was named as a defendant in both actions.

In Kara B.'s case, the trial court granted summary judgment dismissing the § 1983 claims on grounds that the county defendants were entitled to qualified immunity from suit because it had not been shown that they had violated any "clearly established" constitutional right of Kara B. Although unnecessary to resolution of the case because of that ruling, the court went on to

30

decide that the proofs submitted in connection with the summary judgment motions failed to establish a violation of Kara B.'s constitutional rights. The court went on to dismiss Kara B.'s state-law tort claims on grounds that the defendants were entitled to immunity under § 893.80, STATS., for their "discretionary" governmental acts, and also under § 895.485, which specifically immunizes agencies from civil liability for acts or omissions, undertaken in good faith, in connection with placing a child in a foster home.

Mikaela R.'s action alleged similar claims under § 1983 against the same defendants and, as in *Kara B.*, the defendants moved for summary judgment. The trial court denied the motion, concluding that (1) the county defendants were not entitled to qualified immunity from Mikaela R.'s § 1983 claims because they had a known constitutional duty to protect her while she was in the Smit home; and (2) a reasonable jury could find, on the evidence presented, that the defendants had violated that duty.[1] Two additional issues were

---

[1] Both courts framed the constitutional issue in terms of whether the defendants acted with "deliberate indifference" to the plaintiffs' rights, based on cases—notably *Taylor v. Ledbetter*, 818 F.2d 791, 794 (11th Cir. 1987), *cert. denied*, 489 U.S. 1065 (1989)—indicating that a government official's liability under § 1983 for failing to exercise an affirmative duty depends on a showing that (1) "the failure to act [was] a substantial factor leading to the violation of a constitutionally protected liberty or property interest" and (2) the defendants "display[ed] deliberate indifference" to the plaintiff's rights.

As will be seen below, while we agree that government professionals may be subject to liability under § 1983 for actions or inaction resulting in a violation of the plaintiffs' constitutional rights, we do not agree that the proper standard for assessing their conduct in that regard is one of deliberate indifference.

31

raised in Mikaela R.'s case: (1) whether Smit could be considered a "state actor," thus subjecting her to liability under § 1983 in the same manner as the "governmental" defendants; and (2) whether she was an agent or a servant of the department so as to render the county vicariously liable for her negligence toward the children. The trial court ruled that she was both a state actor and an agent of the county. Finally, the court held that the county defendants were not immune from suit under § 893.80, STATS.

## II. Issues and Decision

The parties' briefs raise the following issues with respect to the § 1983 claims: (1) whether the county defendants are entitled to summary judgment dismissing the claims because (a) they are entitled to qualified immunity or, alternatively, (b) there is no evidence that they in fact violated the children's constitutional rights; and (2) whether Smit was a state actor subject to the § 1983 claims in the same manner as the county defendants. The state-law issues are: (1) whether the county defendants are entitled to governmental immunity under § 893.80, STATS. , because their actions with respect to the children and the foster home were "discretionary," as that term is defined and interpreted in the law; and (2) whether Smit was an agent of the department.[2]

We conclude that the county defendants are not entitled to qualified immunity from the § 1983 claims and that whether, under applicable legal standards,

---

[2] Because we conclude that the county defendants are immune from the plaintiffs' state-law tort claims under § 893.80, STATS., we need not consider whether, as they argue, they are also immune under the "good-faith" immunity provisions of § 895.485, STATS.

they violated the children's rights is an issue so closely intertwined with the defendants' intent and motive and other factual issues as to be inappropriate for resolution on summary judgment. We also conclude Smit is not a state actor so as to subject her to liability under § 1983. As to the state-law claims, we hold that the county defendants are entitled to discretionary-act immunity under § 893.80, STATS., and that Smit was not an agent of the county as a matter of law.

We therefore reverse the order in *Kara B.* insofar as it granted the defendants' motion for summary judgment dismissing the § 1983 claims and affirm it insofar as it granted judgment dismissing the state-law claims. In *Mikaela R.*, we affirm the order insofar as it denied the defendants' motion for summary judgment on the § 1983 claims and reverse insofar as it denied the motion on the state-law claims. We also reverse the *Mikaela R.* court's ruling that Smit was both a state actor and a county agent, and we remand both cases to the trial courts for further proceedings consistent with this opinion.

## III. Scope of Review

The parties do not dispute that, in reviewing a grant or denial of summary judgment, we employ the same analysis as the trial court and that our review is de novo. *Ollhoff v. Peck*, 177 Wis. 2d 719, 722, 503 N.W.2d 323, 324 (Ct. App. 1993); *Milwaukee Partners v. Collins Engineers, Inc.*, 169 Wis. 2d 355, 361, 485 N.W.2d 274, 276 (Ct. App. 1992). Summary judgment is appropriate in cases where there is no genuine issue of material fact and the moving party has established his or her entitlement to judgment as a matter of law.

*Germanotta v. National Indem. Co.*, 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984). We do not decide issues of fact in a summary judgment proceeding, nor is the process a " 'short cut to avoid a trial.' " *State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 511, 383 N.W.2d 916, 917-18 (Ct. App. 1986) (quoted source omitted). Indeed, the summary judgment methodology was developed to prevent trial by affidavit or deposition. *Id.* It is equally well recognized that "[t]he remedy of summary judgment does not lend itself to many types of cases, especially those which are basically factual and depend to a large extent upon oral testimony." *Schandelmeier v. Brown*, 37 Wis. 2d 656, 658, 155 N.W.2d 659, 660 (1968). Accordingly, when there is evidence which, under any reasonable view, " 'will either support or admit of an inference in support or in denial of a claim of either party, it is for the jury to draw the proper inference and not for the court to determine which of two or more permissible inferences should prevail.' " *Foryan v. Firemen's Fund Ins. Co.*, 27 Wis. 2d 133, 138, 133 N.W.2d 724, 727 (1965) (quoted source omitted).

## IV. Discussion

### A. The § 1983 Claims: Qualified Immunity

The doctrine of qualified immunity protects public officials and employees from "harassing litigation" by rendering them immune from suit in the performance of their discretionary functions insofar as their conduct does not violate the " 'clearly established' " statutory or constitutional rights of another person. *Barnhill v. Board of Regents*, 166 Wis. 2d 395, 406, 479 N.W.2d 917, 921 (1992) (quoted source omitted).

Whether a public official may be protected by qualified immunity turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time the action was taken. If the law was not clearly established on the subject of the action when it occurred, then the public official cannot be held to know or anticipate that the conduct was unlawful. On the other hand, if the law was clearly established, then the immunity defense should fail because a reasonably competent public official should have known that the conduct was or was not lawful.

. . . "The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Id*. at 407-08, 479 N.W.2d at 921-22 (emphasis omitted; citations omitted; quoted source omitted).

Whether qualified immunity attaches in a particular case is a question of law that we decide without deference to the reasoning of the trial court. *Id*. at 406, 479 N.W.2d at 921. And the plaintiff bears the burden of establishing the existence of the "clearly established" constitutional right. *Id*. at 409, 479 N.W.2d at 922.

Merely alleging a general violation of a right that may be clearly established by the constitution or a statute is insufficient clarity of established law to justify withholding qualified immunity. For example, an allegation that an action violates one's freedom of speech protected under the First Amend-

ment is too general to strip a public official of qualified immunity. On the other hand, the "clearly established law" does not have to specifically correspond with every facet of the present situation. Rather, the "clearly established law" must be sufficiently analogous to provide the public official with guidance as to the lawfulness of his or her conduct.

*Id.* at 408, 479 N.W.2d at 922.

The *Kara B.* court reasoned as follows in concluding that the defendants were entitled to qualified immunity: the government has a duty to protect an individual from private acts of violence where a "special relationship" exists between the government and the individual, but there is no "clearly established" law recognizing such a relationship between the government and a foster child.[3]

In so holding, the court placed principal reliance on *Doe v. Bobbitt*, 881 F.2d 510, 511-12 (7th Cir. 1989), *cert. denied*, 495 U.S. 956 (1990), where the court of appeals held that—as of "early 1984"—there was no clearly established authority "that a public official who places a child at risk of harm from private individuals in a foster home violate[s] that child's constitutional

---

[3] Citing *Estelle v. Gamble*, 429 U.S. 97 (1976), and *Youngberg v. Romeo*, 457 U.S. 307 (1982)—cases we discuss in more detail below—the court acknowledged that "[a] consensus has been reached regarding the existence of such a special relationship between the State and incarcerated persons [ *Estelle*] and between the State and involuntarily committed mental patients [*Youngberg* ]," but it concluded that "at the times relevant to this case . . . a sufficient consensus had not been reached regarding the existence of a special relationship between the State and a foster child in its care."

rights."[4] The defendants rely heavily on *Bobbitt* on this appeal.

Kara B. argues that *Bobbitt* is distinguishable because the child in that case had been placed not in a licensed foster home but in the home of a relative—an aunt—when the abuse occurred.[5] We agree, and our conclusion is bolstered by the same court's reasoning in a later case, *K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990), where it rejected a qualified immunity defense interposed by state welfare workers who had placed the infant plaintiff in one or more foster homes where she was severely abused.

Like the trial court and the defendants in this case, the *K.H.* defendants read *Bobbitt* as holding that, at least in early 1984, a child had no clearly established right to seek redress against them for their claimed violation of her substantive due process rights in connection with her placement and maintenance in a foster home. The *K.H.* court rejected the argument,

---

[4] The *Bobbitt* court stated that, as of 1984, only one case held that such a right existed—*Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983), a case the *Bobbitt* court felt "depended upon an absolutely novel analogy between incarceration and placement in a foster home." *Doe v. Bobbitt*, 881 F.2d 510, 511-12 (7th Cir. 1989), *cert. denied*, 495 U.S. 956 (1990).

[5] The *Bobbitt* opinion refers to the report of the district court decision in *Doe v. Bobbitt*, 665 F. Supp. 691, 693-94 (N.D. Ill. 1987), for a discussion of the underlying facts. The district court decision states simply that the child was "placed . . . in the home of . . . the child's aunt." *Id* . at 693. There is no indication that the aunt maintained a "foster home," licensed or otherwise. Indeed, in *K.H. v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990), the court, discussing *Bobbitt*, stated: "The aunt who was awarded custody of the plaintiff in *Doe v. Bobbitt* was *not* a foster parent . . . ." (Emphasis added.)

holding that *Bobbitt* was distinguishable because the child in that case had been placed not in a foster home but with a family member. The court said that "there is indeed a difference between placing a child with a member of her family and placing the child with a foster parent."[6] *K.H.*, 914 F.2d at 852.

---

[6] The defendants also suggest that the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), supports dismissal of the actions. We disagree. *DeShaney*, like *Bobbitt*, did not involve placement in a foster home; the plaintiff in *DeShaney* was abused after the agency returned him to his natural parent.

In *K.H.* the court saw a material difference between cases, like *DeShaney*, "where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state" and cases—such as the ones under consideration here—where the state removes a child from parental custody and places him or her in a foster home. In the latter, said the *K.H.* court, the state assumes a duty not to act so as to deprive the child of his or her constitutional rights. *K.H.*, 914 F.2d at 848-49.

For similar reasons, these cases are distinguishable from *Jones v. Dane County*, 195 Wis. 2d 892, 921-22, 537 N.W.2d 74, 83 (Ct. App. 1995), where a child whom the county had returned to his family home shot and seriously wounded one of his parents. We concluded that because the child had been returned to his parents and was no longer in a custodial relationship with the county, there was no such "special relationship" between the county and either the child *or* the wounded parent, as would support a § 1983 substantive due process claim.

In these cases, as we note elsewhere in this opinion, not only were orders in effect granting temporary custody of Kara B. and Mikaela R. to Dane County but both children were in the custodial care of a county-licensed foster home at the time the assaults occurred. And, as may be seen below, in cases involving foster-home placements similar to Kara B.'s and Mikaela R.'s,

The court's opinion in *K.H.* is instructive on the merits of the qualified immunity issue as well, for it was dealing with placements made in 1986 and preceding years—before Kara B.'s initial placement in the Smit home. Recognizing that the defendants' qualified immunity could be pierced "only if the specific right they violated was clearly established *at the time they violated it*," the *K.H.* court decided the issue against them. *Id.* at 849, 850 (emphasis added). Thus, while the opinion in *K.H.* was issued in 1990 (after Kara B. had left the Smit home), the court recognized, both implicitly and explicitly, that the plaintiff child's right to have government officials act in a manner consistent with her constitutional rights had been clearly established at the time of her placement in 1986.[7]

In so holding, the *K.H.* court discussed *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982), where the Supreme Court ruled that a person committed involuntarily to a state mental institution has a substantive due process right to "reasonable care and safety" during his or her confinement. According to the court of appeals:

courts have upheld § 1983 claims when a government professional's action or inaction results in the deprivation of constitutional rights of a child in foster care.

[7] The court stated:

The immunity issue is whether this right can be said, on the basis of *Youngberg* and *Doe* [ *v. New York City Dep't of Social Servs.*], to have been clearly established in 1986. It can be. *Youngberg* made the basic duty of the state to children in state custody clear, and *Doe* added the obvious corollary that the duty could not be avoided by substituting private for public custodians. No case held the contrary and there was no reason to think that *Doe* would not be followed in this circuit.

*K.H.*, 914 F.2d at 852.

> *Youngberg* . . . made clear, years before the
> defendants in this case placed K.H. with an abusing
> foster parent in 1986, that the Constitution
> requires the responsible state officials to take steps
> to prevent children in state institutions from deteri-
> orating physically or psychologically . . . . No case
> authoritative within this circuit, however, had held
> that the state had a comparable obligation to pro-
> tect children from their own parents, and we now
> know that the obligation does not exist in constitu-
> tional law . . . . Ours is the intermediate case in
> which the state places the child in a private foster
> home . . . and fails to take steps to prevent the child
> from deteriorating physically or psychologically as a
> result of . . . mistreatment . . . .

*K.H.*, 914 F.2d at 851.

Another case establishing the existence of such a right at times appropriate to the instant cases is *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983). There, the child, Anna Doe, was placed in a foster home in 1964 through the office of the New York City Commissioner of Welfare and its agent, the Catholic Home Bureau. At the time of her placement, available information indi-cated that the home was a good one. In succeeding years, however, Anna was subjected to a "pattern of persistent cruelty . . . at the hands of her foster father," including regular and severe physical and sexual abuse. *Id.* at 137. The agencies annually evaluated and approved the household as a foster home for Anna despite receiving information suggesting the abuse to which she was being subjected.[8] Eventually, Anna was

---

[8] As early as 1975, the agencies learned that Anna had been engaging "extensively" in group sex—including "full sexual intercourse"—with other children in her school. She was then fourteen years old. At about that time, the agencies had her

removed from the home and brought a § 1983 action against the agencies. The case was tried to a jury, which returned a verdict in favor of the defendants. *Id.* at 139-40.

The court of appeals reversed, concluding that the trial court had erroneously instructed the jury on the standard of conduct applicable to the defendants—an issue we discuss in detail elsewhere in this opinion. For present purposes, *Doe* indicates that, as early as the mid-1970's, government employees charged with the placement and supervision of children in foster homes could be held liable under § 1983 for actions or inaction resulting in the violation of the children's constitutional rights. *Id.* at 145.

The Court of Appeals for the Eleventh Circuit came to a similar conclusion in *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987), *cert. denied*, 489 U.S. 1065 (1989). In *Taylor*, the child, who had been placed in a foster home in 1982, sued the officials responsible for her placement and supervision after she was physically abused by the operator of her foster home. She alleged that the officials had been "deliberately indifferent to her welfare when deciding to place her, and after placing her, in the foster home." *Id.* at 793. Analogizing the foster child's situation to that of the institutionalized individual in *Youngberg* and the prisoner in *Estelle v.*

examined by a psychiatrist, who concluded that she had been sexually involved with her foster father for some time and recommended her immediate removal from the household. No such steps were taken by the agencies and Anna's placement continued. Finally, in July 1977, Anna's foster mother, by then involved in divorce proceedings, told the agencies that she had found her husband and Anna in bed together. Anna and other children in the home were removed shortly thereafter.

*Gamble*, 429 U.S. 97 (1976),[9] the court held that "a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a [patient] confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." *Taylor*, 818 F.2d at 797.

Finally, in *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 885, 892-93 (10th Cir. 1992), the court, citing *Youngberg*, *Doe* and *Taylor*, held that as early as August 1985, the law was "clearly established . . . that a child [placed in a foster home] had a constitutional right to be protected from bodily harm from private third parties . . . ."

The events of which the plaintiffs in these cases complain—their placement in the Smit home and the subsequent monitoring of that placement by the county defendants—occurred between March 28, 1989, when Kara B. entered the home, continued through Mikaela R.'s placement in June 1990, and ended on December 18, 1990. We are satisfied that at and during those times the "clearly established law" was—and is—that a foster child involuntarily taken from his or her parents' home and temporarily placed in the custody of the government for placement in a licensed foster home[10] has

---

[9] In *Estelle*, the Supreme Court held that in order to state a claim for violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must allege facts showing "deliberate indifference" on the part of state actors to the inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[10] The dispositional order in Kara B.'s CHIPS case ordered "[t]emporary non-secure custody [in the department] to permit placement . . . in foster care . . . ." In Mikaela R.'s case, the court

a substantive due process right, actionable under 42 U.S.C. § 1983, to physical and emotional safety while in such placement and that, as a result, the defendants' qualified immunity defense must fail.

## B. Scope of the Defendants' Constitutional Duty

The cases diverge on the scope of the constitutional duty owed by government agencies and professional personnel to persons actually or constructively in the government's custody. In the prison situation, *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), and, more recently, *Farmer v. Brennan*, 114 S.Ct. 1970 (1994), hold to the concept of "deliberate indifference": that in order for the governmental defendants to be liable—at least on a claim grounded in the Eighth Amendment—they must have exhibited deliberate indifference to a risk to the plaintiff inmate that was *actually known to them.*[11] In the non-prison setting, where the claim is brought under the substantive due process provisions of the Fourteenth Amendment—as are the claims in these cases—courts have split over whether the Eighth Amendment deliberate-indifference standard, or some less strict standard, applies.

---

ordered that she be "placed under the protective supervision of the [c]ourt for . . . one year . . . [with] [s]upervision . . . to be provided by the Dane County Department of Human Services."

[11] In *Farmer*, the court held that

a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 114 S.Ct. 1970, 1979 (1994) (emphasis added).

Two federal circuits, in cases we have already referred to, have applied the *Estelle/Farmer* Eighth Amendment deliberate-indifference test—or something very close to it—to actions brought by children who suffered physical and sexual abuse while involuntarily in foster care. In *Doe v. New York City Dep't of Social Servs.*, the court recognized the difference between the close control exercised by the government over prisoners and the broader supervision exercised over foster parents, who need to retain autonomy in raising the children; nonetheless, it implemented a subjective test that required "some knowledge triggering an affirmative duty to act" on the part of the defendants. "Defendants may be held liable under § 1983 if they . . . exhibited deliberate indifference to *a known injury* [or] *a known risk* . . . and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights . . . ." *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 145 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983). The *Taylor* court adopted the *Doe* test verbatim, specifically analogizing between the foster child's situation—and his or her substantive due process rights—and that of a prison inmate. *Taylor v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987), *cert. denied*, 489 U.S. 1065 (1989).

Another line of authority is applied in cases involving abuse in foster homes, and we believe it is more appropriate to the situation. It begins with *Youngberg v. Romeo*, 457 U.S. 307 (1982), discussed above, which held that a retarded person who had been involuntarily committed to a state mental institution had a substantive due process right to physical safety while

44

institutionalized.[12] *Id.* at 324. Because the Court believed that persons involuntarily committed to mental institutions under the civil law "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *id.* at 321-22, it looked not to the subjective deliberate-indifference test of *Estelle* and other prison cases but to a more objective test akin to that applicable in assessing medical malpractice claims: a "professional judgment" standard. "The Constitution," said the Court,

> "only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made. . . ."
> . . . [L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 321, 323 (quoted source omitted).[13] Other courts have followed *Youngberg* in actions by persons committed to mental hospitals. *See, e.g., Society for Good Will*

---

[12] Like *Estelle*, the case began with a claim under the cruel-and-unusual-punishment provisions of the Eighth Amendment. Both the court of appeals and the Supreme Court, however, felt that the rights at stake were substantive Fourteenth Amendment due process rights, and the appeals proceeded on that basis. *Youngberg*, 457 U.S. at 312-13, 314.

[13] The Court noted in this regard that:

In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of

*to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1089 (2d Cir. 1990); *Shaw v. Strackhouse*, 920 F.2d 1135, 1139 (3d Cir. 1990); *Estate of Porter*, 36 F.3d 684, 688 (7th Cir. 1994).

At least one appellate court has decided that the *Youngberg* test is applicable to a § 1983 action against professional employees of a state agency who had placed the plaintiff children in a foster home where they were sexually abused. In *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883 (10th Cir. 1992), two children sued various professional employees of the New Mexico Department of Human Services for physical and sexual abuse they had suffered after being placed in foster care. The defendants argued that their actions should be judged under the *Estelle* deliberate-indifference test; plaintiffs urged the court to adopt the *Youngberg* standard. *Yvonne L.*, 959 F.2d at 893. The court followed *Youngberg*, reasoning as follows:

> The compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are "entitled to more considerate treatment and conditions" than criminals [citing *Youngberg*, 457 U.S. at 321-22]. These are young children, taken by the state from their parents for reasons that generally are not the fault of the children themselves.

*Id.* at 894.

We are satisfied that *Youngberg* and *Yvonne L.* state the proper standard to evaluate § 1983 Fourteenth Amendment claims of foster children against

---

budgetary constraints; in such a situation, good-faith immunity would bar liability.

*Youngberg*, 457 U.S. at 323.

agency professionals. Certainly children in foster care occupy a position significantly different from that of prisoners. In *Youngberg*, the Supreme Court recognized that persons involuntarily committed to mental institutions possess greater rights than prisoners, and we believe that children in need of foster care, who have done society no wrong and deserve no punishment, are entitled to constitutional protection to at least the degree afforded to persons institutionalized through the civil commitment process.

The more permissive *Estelle/Farmer* deliberate-indifference test would not serve that distinction for it would force foster children to endure constitutional deprivations absent a showing of deliberate indifference on the part of their caretakers. The more strict professional judgment standard, on the other hand, recognizes not only that children placed in the custody of the state through no fault of their own are situated far more similarly to institutionalized mental patients (*Youngberg*) than to convicted criminals (*Estelle/Farmer* ) but also that it would be inappropriate to hold the children's caretakers liable for constitutional deprivations in situations where they had exercised professional judgment in determining the best course of conduct with respect to the children.

We conclude, therefore, that the standard to be applied to assess the professional defendants' conduct toward these plaintiffs is an objective test based on their compliance with recognized standards applicable to their professions. It is not a subjective standard predicated on actual knowledge of harm or risk, nor is

it a reasonable person standard by which determinations of negligence and recklessness are made.[14]

The standard we apply in this case is one that imposes liability "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. It is not for courts to specify which of several professionally acceptable choices should have been made, or whether the optimal course of conduct as determined by some experts was followed, but whether professional judgment in fact was exercised. *Society for Good Will to Retarded Children*, 902 F.2d at 1089.

Obviously, expert testimony must establish the bounds of acceptable, constitutional activity, keeping in mind that the issue is not whether the exercised professional judgment was indisputably correct—or even a better choice than others—but only whether the defendants have substantially met professionally accepted minimum standards with respect to the actions that were taken, or not taken, in the particular case.

In these cases, both trial courts tested the summary judgment motions using the *Estelle/Farmer* deliberate-indifference test. The *Kara B.* court, after ruling the defendants were entitled to qualified immunity, held in the alternative that they were entitled to summary judgment in any event because the plaintiffs' proofs on the motion failed to establish that they "had actual knowledge of abuse or deliberately failed to

---

[14] Indeed, it is well settled in the law that where, as here, a party claims deprivation of due process, mere negligence will not support a § 1983 action. *Daniels v. Williams*, 474 U.S. 327, 329, 330-31 (1986).

learn what was occurring in the Smit foster home." The *Mikaela R.* court, employing a similar "actual knowledge" standard, concluded that the proofs were sufficient to raise an issue for trial.

That standard, as we have said, is inappropriate in cases such as this. And summary judgment is equally inappropriate on this record. First, and perhaps most significant, the record is barren of any expert evidence bearing on the defendants' exercise of professional judgment in placing and maintaining the children in the Smit home. Second, as we have noted above, summary judgment is an appropriate remedy only in cases where no factual disputes—or disputed inferences from undisputed facts—exist; it is not a short cut to avoid a trial and the procedure does not lend itself to factually complex cases. "If the material presented on the motion is subject to conflicting interpretations or reasonable people might differ as to its significance, it would be improper to grant summary judgment." *Coleman v. Outboard Marine Corp.*, 92 Wis. 2d 565, 571, 285 N.W.2d 631, 634 (1979).

The record in these actions is voluminous, exceeding 2,000 pages, although the cases have progressed only to the pretrial motion stage. And the facts emphasized in the parties' arguments on the claimed constitutional violations are grounded on extensive and wide-ranging facts found in depositions, reports of investigations, evaluations, conversations and meetings involving more than thirty individuals—including social workers, consultants, the children's relatives, attorneys, guardians, teachers, psychiatrists, therapists and various employees and officials of the department of human services—all going to what the county defendants did or did not do with respect to the children's placement and residence in the Smit home.

Summary judgment is an inappropriate vehicle for determining the plaintiffs' constitutional claims.

We conclude, therefore, that the *Kara B.* court erroneously granted the defendants' motions for summary judgment dismissing plaintiffs' § 1983 claims, and that the *Mikaela R.* court properly denied the motions.

C. *The § 1983 Claims: Foster Home Operator as State Actor*

Mikaela R.'s amended complaint alleges that Smit was acting on behalf of the government—the Department of Social Services—in operating the foster home, and was thus subject to liability under § 1983 in the same manner as the county defendants. The trial court agreed, reasoning that the state's power to place children in foster homes and to regulate the homes makes foster home operators agents of the state as a matter of law.

A plaintiff in a § 1983 action seeking redress for violation of a constitutional right must allege that the defendant was acting under color of state law— that he or she was a state actor.[15] *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 928 (1982). The requirement is intended to avoid imposing responsibility on the government for conduct it cannot control. *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191 (1988). The principal inquiry is whether the challenged conduct is

[15] In this analysis, the "state" is synonymous with the "government"—in this case, the county Department of Social Services and its agents, operating under a variety of state and county laws and regulations.

50

"fairly attributable to the State." *Lugar*, 457 U.S. at 937.

In making that assessment, federal courts have adopted a three-part test most recently described in *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). The first element, called the "public function" test, asks whether the private party was exercising powers that are traditionally and exclusively reserved to the government. The second, the "state compulsion" test, asks whether the state is exercising such "coercive power" or providing such "significant encouragement, either overt or covert," that in law the private actor's choice must be deemed to be that of the state. The third, the "symbiotic relationship" or "nexus" test, asks whether there is such a sufficiently close nexus between the government and the challenged private action that it may be fairly treated as that of the government.

The trial court ruled that Smit was a state actor under all three tests, solely on the basis of the state's power to place children in foster care and to regulate foster homes.[16]

With respect to the public function test, Mikaela R. argues that the trial court was correct in concluding that "the . . . test had been met because the state is the only party who can involuntarily remove a child from its natural home." We agree with the defendants, how-

---

[16] According to the court: (1) Smit was engaged in a public function because the government was "responsible for the original placement and supervision of [Mikaela R.'s] foster care"; (2) the state compulsion test was met by the state's authority to secure compliance by foster homes with regulatory requirements; and (3) the "plethora" of government regulations of foster homes "is so pervasive as to amount to a symbiotic relationship."

51

ever, that the trial court misapplied the test. Its correct focus is not the power of the government but the activities engaged in by the foster parent; that is, whether the foster parent is exercising powers that are traditionally reserved for the state. "The care of foster children is not traditionally the exclusive prerogative of the State." *Milburn v. Anne Arundel County Dep't of Social Servs.*, 871 F.2d 474, 479 (4th Cir.), *cert. denied*, 493 U.S. 850 (1989).

As to the compulsion test, Mikaela R. argues that the state's exercise of its power to remove her from her family and place her in a foster home, coupled with the "many regulations the government imposes on the foster parent," constitute such state "coerc[ion]" that Smit's own conduct must as a matter of law be "deemed to be that of the [government]." *See Wolotsky*, 960 F.2d at 1335. Again, we disagree. In *Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992), *aff'd*, 25 F.3d 304 (6th Cir.), *cert. denied*, 115 S. Ct. 485 (1994), the court rejected a similar argument, noting that the state did not exercise coercive power over foster parents because the "[d]ay-to-day parenting decisions were left to the judgment of the [foster parents]."[17]

---

[17] We are not bound by decisions of federal trial courts. *Professional Office Bldgs. v. Royal Indem. Co.*, 145 Wis. 2d 573, 580-81, 427 N.W.2d 427, 429-30 (Ct. App. 1988). However, *Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992), *aff'd*, 25 F.3d 304 (6th Cir.), *cert. denied*, 115 S. Ct. 485 (1994), has been cited to us by both Mikaela R. and the trial court; as before, we are persuaded by the district court's reasoning on the point.

Additionally, defendants point out that many of the Wisconsin regulations governing foster homes are general in scope, dealing, for example, with physical requirements for the homes—living-space size, type of heating systems, etc. WIS. ADM. CODE § HSS 56.05. And many that may be said to relate to

We also agree with the defendants that Mikaela R. has not established that Smit was a state actor under the symbiotic relationship test. She argues that state statutes and administrative regulations, "when analyzed in conjunction with the other two parts of the test, rise[ ] to the level of a symbiotic relationship between the state and the foster parent . . . ." First, we have concluded that the other two parts of the test have *not* been met. Second, for purposes of the color-of-state-law requirement of § 1983, "the fact that regulation of the [actor] was extensive and detailed did not by itself convert its action into that of the State." *Milburn*, 871 F.2d at 477 (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974)). *See also Wolotsky*, 960 F.2d at 1335 (the mere fact that an entity is subject to state regulation does not render its activities state action).

Finally, we note the *Lintz* court's remark that it was "unaware of any case which has held that foster parents are state actors. Indeed, courts in other jurisdictions have refused to attribute the actions of foster parents to the state." *Lintz*, 807 F. Supp. at 1306. Mikaela R. has not offered any authority to the con-

the care of foster children are only very generally stated. See, e.g., § HSS 56.07, entitled "Care of foster children," which states that foster children are to receive "humane and nurturing care," "respect[ ]," and "room to grow and the maximum of personal and physical freedom appropriate to the child's age and maturity." Other provisions require that children under five years of age receive physical examinations every twelve months and that children may not be punished by depriving them of meals, mail and family visits. Section HSS 56.07(4)(b) and (5)(f). We agree with the defendants that such generally worded "regulations" cannot fairly be said to constitute the type of extensive control over a foster parent's day-to-day parenting decisions that would be necessary to convert the parent into a state actor under the tests discussed herein.

trary; indeed, the principal cases discussed by all the parties to these appeals, *Milburn* and *Lintz*—together with *Pfoltzer v. County of Fairfax*, 775 F. Supp. 874, 891 (E.D. Va. 1991)[18]—hold that foster parents are not state actors for purposes of a § 1983 action.

Mikaela R. has not persuaded us that Smit is a state actor for purposes of § 1983 liability under the accepted tests.

## D. The State-Law Claims: "Discretionary Immunity"

Section 893.80(4), STATS., states that no action may be maintained against public agencies or employees "for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." The statutory terms "quasi-legislative" acts and "quasi-judicial" acts have been recognized as synonymous with "discretionary" acts—those involving " 'the exercise of discretion and judgment.' " *Harkness v. Palmyra-Eagle Sch. Dist.*, 157 Wis. 2d 567, 574-75, 460 N.W.2d 769, 772 (Ct. App. 1990).

> Thus, a public officer . . . is immune from suit where the act or acts complained of are "discretionary," as opposed to merely "ministerial," and the terms have been discussed and applied in several cases.
> Generally, a discretionary or quasi-legislative or quasi-judicial act "involves the exercise of discre-

---

[18] In *Pfoltzer*, the court, citing *Milburn v. Anne Arundel County Dep't of Social Servs.*, 871 F.2d 474, 479 (4th Cir.), *cert. denied*, 493 U.S. 850 (1989), noted that foster parents are not state actors "where . . . the foster homes were not operated by the [government]." *Pfoltzer v. County of Fairfax*, 775 F. Supp. 874, 884-85 (E.D. Va. 1991).

> tion and judgment . . . ." A nonimmune "ministerial"
> act, on the other hand is one "where the . . . duty is
> absolute, certain and imperative, involving merely
> the performance of a specific task," and "the time,
> mode and occasion for its performance" are defined
> "with such certainty that nothing remains for the
> exercise of judgment and discretion."

*Id.* at 574-75, 460 N.W.2d at 772 (citations omitted; quoted source omitted).

The purpose of immunity provisions such as those found in § 893.80(4), STATS., is to ensure that courts are not called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions " ' "furnish[ ] an inadequate crucible for testing the merits of social, political, or economic decisions." ' " *Gordon v. Milwaukee County*, 125 Wis. 2d 62, 66, 370 N.W.2d 803, 805 (Ct. App. 1985) (quoted sources omitted).

The *Kara B.* court concluded that the county defendants were entitled to immunity under the statute and the *Mikaela R.* court ruled they were not. Kara B. argues that the trial court erred in so holding because, in her view, the defendants' acts, while discretionary in nature, were decisions made at the "operational level," rather than the "planning level," and, as such, did not involve the exercise of "governmental" discretion to which immunity attaches. As authority for the proposition, she points to *Jablonski v. United States*, 712 F.2d 391 (9th Cir. 1983), and a reference to *Jablonski* in *Gordon*, 125 Wis. 2d at 68, 370 N.W.2d at 807. The reference in *Gordon* was only in passing, however. We did not adopt the "operational/planning" distinction in *Gordon*; nor did we apply it to the facts the case in arriving at our deci-

sion. As much as may be said is that we referred to *Jablonski* in the course of our opinion in *Gordon*. The reference has no precedential value.

As to the merits of *Gordon*, we there held that while the performance of "a psychiatric examination and diagnosis" was discretionary, "the discretion used is professional, or medical, not governmental." *Gordon*, 125 Wis. 2d at 67, 370 N.W.2d at 806. In a more recent case, *Stann v. Waukesha County*, 161 Wis. 2d 808, 818 & n.3, 468 N.W.2d 775, 779 (Ct. App. 1991), we distinguished *Gordon* and two other cases reaching similar results, stating that "[o]nly three Wisconsin decisions have recognized . . . a distinction" between "governmental" and nongovernmental discretion and that "each of these cases involved allegations of negligence regarding medical decisions." As we concluded in *Stann*, "These cases are restricted to their facts, as no Wisconsin decision applies this exception in any other setting." *Id. See also Linville v. City of Janesville*, 174 Wis. 2d 571, 584-85, 497 N.W.2d 465, 471 (Ct. App. 1993), *aff'd*, 184 Wis. 2d 705, 516 N.W.2d 427 (1994).[19]

We agree with the *Kara B.* trial court that this case is much closer to *C.L. v. Olson*, 143 Wis. 2d 701, 422 N.W.2d 614 (1988), where the supreme court upheld the immunity of a parole officer sued for negligence in

---

[19] The concurring/dissenting judge, apparently recognizing that *Stann v. Waukesha County*, 161 Wis. 2d 808, 818, 468 N.W.2d 775, 779 (Ct. App. 1991), and *Linville v. City of Janesville*, 174 Wis. 2d 571, 584-85, 497 N.W.2d 465, 471 (Ct. App. 1993), *aff'd*, 184 Wis. 2d 705, 516 N.W.2d 427 (1994), constitute binding precedent on the subject, would have them overruled to reach the opposite result. *See In re Court of Appeals*, 82 Wis. 2d 369, 371, 263 N.W.2d 149, 149-50 (1978) (per curiam); *Ranft v. Lyons*, 163 Wis. 2d 282, 299-300 n.7, 471 N.W.2d 254, 260-61 (Ct. App. 1991).

allowing a parolee under his supervision to operate a motor vehicle (injuring the plaintiff) and/or failing to impose restrictions on the operation of the vehicle. In so ruling, the court looked to *Scarpaci v. Milwaukee County*, 96 Wis. 2d 663, 685-86, 292 N.W.2d 816, 827 (1980), which held that while a medical examiner's performance of an autopsy involved professional discretion unrelated to a governmental purpose, the examiner's decision whether to undertake the autopsy in the first instance was the type of governmental discretion to which immunity should attach. The *Olson* court said:

> Finally, plaintiff has advanced [the] argument that the allegedly negligent judgment of the parole agent did not involve governmental discretion, but professional judgment akin to that considered in *Scarpaci*. We disagree. The judgment of the parole officer insofar as the discretionary imposition of rules and conditions of parole are concerned involves a decision-making process more comparable to a medical examiner's decision to perform an autopsy, which in *Scarpaci* was found to constitute governmental discretion, than to judgment exercised in the actual performance of the autopsy, which was found to be excepted from the doctrine of immunity. Like the decision to perform an autopsy, the discretion required of a parole officer requires a subjective evaluation and application of the law to the facts presented in an individual case. While the parole officer is given flexibility in the decisions to be made regarding a parolee, the framework within which that discretion is to be exercised is . . . regulated [by the administrative code]. Thus, while professional judgment is implicated in a parole agent's decision, generally, regarding the imposition of rules and conditions of parole and,

specifically, regarding the grant of permission to operate a vehicle, the discretion involves the evaluation of public policies within a regulated framework and consequently fundamentally constitutes discretion of a governmental nature.

*Id.* at 724-25, 422 N.W.2d at 623 (citations omitted; footnote omitted).

We have quoted at length from *Olson* because we think similar considerations operate here. Like the parole officer, agents and employees of the Dane County Department of Human Services act within a framework of laws and administrative rules when they place children in foster care and monitor and regulate foster homes. The discretionary determinations and decisions made within that framework involve not only the consideration and evaluation of a variety of professional considerations but also, as in *Olson*, "the evaluation of public policies within a regulated framework."

We conclude that the types of decisions and determinations being challenged in the cases before us—relating as they do to the activities of employees and agents of a public agency charged with administering foster care and related programs established and regulated by law—are well within the type of governmental discretion to which immunity attaches under Wisconsin law. We therefore conclude that the *Kara B.* trial court properly granted the defendants' motion for summary judgment on that issue and that the *Mikaela R.* court erred in denying the motion.

## E. The State-Law Claims: Foster Home Operator as County Agent

Mikaela R. argued to the trial court that Smit was an agent of Dane County so that the county would be liable for her torts under state law. The trial court agreed on the basis of the following factors: (1) in a written departmental policy statement, foster parents are identified as "agents"; (2) the county licensed Smit as a foster parent and "controlled" the home through visits and regulations; and (3) Smit "accepted" a foster-home license and took in foster children.

The department's policy statement deals with investigations of alleged child abuse "involving agents of the county," and states that, " *[f]or purposes of this policy*, an 'agent of the county' includes . . . foster family members." (Emphasis added.) The intent of the policy statement is two-fold: "to first provide adequate protection for children alleged to be abused . . . but also to prove an unbiased, coordinated investigation which minimizes duplication and the number of contacts with involved parties." We agree with the defendants that the policy statement operates only in a very narrow area: to ensure the county's ability to conduct unbiased investigations of alleged child abuse involving county agents, as required by state law. Accordingly, the county has defined the term in the policy statement as including all persons whose circumstances or situations might make it difficult for the county itself to conduct an unbiased investigation.[20] We do not believe

---

[20] In addition to foster families, others mentioned—along with permanent county employees—in the "definition" of agents are "group home staff, day treatment staff, or others in circumstances where 'there is a substantial probability that the county agency . . . would not conduct an unbiased investigation.' "

the policy statement was intended to define foster parents as agents of the county for any and all other purposes—and particularly not for purposes of vicarious county liability, as is argued here.

The other factors briefly listed by the trial court in support of its conclusion that Smit was an agent of the county relate to the county's function as a regulator and licensor of foster homes. Whether a person may be considered a "servant" for purposes of vicarious liability, however, involves the determination and analysis of several " 'matters of fact' " going to whether he or she meets the legal definition of a servant as " 'a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.' " *Arsand v. City of Franklin*, 83 Wis. 2d 40, 46 n.4, 264 N.W.2d 579, 582 (1978) (quoting RESTATEMENT (SECOND) AGENCY § 220 (1958)). Among these factual matters are: the extent of the "master's" control "over the details of the work"; whether the employee "is engaged in a distinct occupation or business"; whether the work is usually done under the employer's direction or "by a specialist without supervision"; whether the employer supplies the instrumentalities and the place of work; and whether the work is part of the employer's "regular business." *Id.*

It is true, as Mikaela R. points out, that agency—or, more particularly, whether one is the "servant" of another for purposes of vicarious liability—is generally considered a question of fact for the jury. Here, however, Mikaela R. has put forth no cases or other authority suggesting that foster parents are "servants" under the *Arsand*/RESTATEMENT formula. More importantly, all the authority appears to go the other

way. *See Sayers v. Beltrami County*, 472 N.W.2d 656 (Minn. Ct. App.), *rev'd on other grounds*, 481 N.W.2d 547 (Minn. 1992); *Kern v. Steele County*, 322 N.W.2d 187 (Minn. 1982); *Simmons v. Robinson*, 409 S.E.2d 381 (S.C. 1991); *Stanley v. State Indus., Inc.*, 630 A.2d 1188 (N.J. Super. Ct. Law Div. 1993); *Blanca C. v. County of Nassau*, 480 N.Y.S.2d 747 (N.Y. App. Div. 1984), *aff'd*, 481 N.E.2d 545 (N.Y. 1985). In most of these cases, the courts concluded as a matter of law that the governmental agency lacked the requisite degree of control over how the foster parents undertook the day-to-day care of the children. Mikaela R. has not persuaded us that the Wisconsin system merits any different consideration.

Finally, we note that § 48.627, STATS., requires foster homes to carry liability insurance "for acts or omissions by or affecting a child who is placed in [the] home," and further authorizes the Department of Human Services to purchase such insurance for the foster homes. Section 48.627(2)(a) and (2)(c). We agree with Wisconsin's attorney general, who noted in a 1986 opinion on a related subject that "[t]his legislation would have been unnecessary if foster parents were state agents." 75 Op. Atty. Gen. 43, 45 (1986).

We conclude that, as a matter of law, Smit was not an agent of the county so as to make the county liable for negligent acts in the performance of her services as a foster parent.

*By the Court.*—Judgments affirmed in part; reversed in part and cause remanded for further proceedings consistent with this opinion.

61

SUNDBY, J. (*concurring in part; dissenting in part*). Foster children suffer abuse ten times more often than children in the general population.[1] When the state places a child in foster care, it must take special care that it does not place the child in Judge Posner's metaphorical snake pit. *See Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).[2] It therefore assumes an affirmative duty to protect that child; a duty compelled by the Due Process Clause. Terrence J. Dee, *Foster Parent Liability under Section 1983: Foster Parents' Liability as State Actors for Abuse to Foster Children*, 69 WASH. U. L.Q. 1201, 1207 & n.39 (1991). The defendant social workers claim, however, that even if a foster child has a constitutional liberty interest in his or her safety when placed in foster care by the state, they are entitled to qualified immunity because that right was not "clearly established" in 1989 and 1990 when Kara B. and Mikaela R. were placed and maintained in the foster care of Roxanne Smit. I join my colleagues in rejecting that claim.

I part company from them, however, when they conclude that the foster parent is not liable under 42 U.S.C. § 1983 because she was not acting under color of state law when she acted as a state-licensed foster parent. I also dissent from the majority's holding that the

---

[1] Terrence J. Dee, *Foster Parent Liability under Section 1983: Foster Parents' Liability as State Actors for Abuse to Foster Children*, 69 WASH. U. L.Q. 1201, 1201 (1991) (citing Michael B. Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse and Neglect*, 23 HARV. C.R.-C.L. L. REV. 199, 206 & n.30 (1988)).

[2] "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."

defendant social workers are immune from liability under state tort law because their acts were discretionary. *See* § 893.80(4), STATS.

## BACKGROUND

In 1989, the juvenile court determined that Kara B. was a child in need of protection or services, and placed her with Roxanne Smit, whose home had been recently licensed as a foster home. On June 11, 1990, Mikaela R. was placed in Smit's home. On December 18, 1990, Mikaela was raped in the home. Kara B. then revealed that she had been sexually abused by one of Smit's male friends and by Smit.

Appellants allege that defendants were deliberately indifferent to Kara's situation and are liable for her injuries in a civil rights action under § 1983. Defendants argue, however, that they are entitled to qualified immunity because at that time it was not "clearly established" that the state had an obligation commanded by the Due Process Clause to protect children it placed in foster homes. *See Barnhill v. Board of Regents,* 166 Wis. 2d 395, 406, 479 N.W.2d 917, 921 (1992).

Respondents contend that *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189 (1989), demonstrates that in 1989 it was not "clearly established" that children placed by the state in foster care had a liberty interest in their personal safety protected by the Due Process Clause.

## SECTION 1983 LIABILITY: QUALIFIED IMMUNITY

If the Due Process Clause provides constitutional protection of the liberty interest of foster children in their personal safety, defendants may escape liability if

that right was not "clearly established" when defendants placed and kept Kara and Mikaela in Smit's home.

A public officer or employee has a qualified immunity from suit and liability under § 1983 if the claimed constitutional right was not "clearly established" when the officer or employee took the action complained of. *Barnhill*, 166 Wis. 2d at 406, 479 N.W.2d at 921.

In a footnote to its holding, the *DeShaney* ·Court responded to an allegation of the complaint that Joshua was in the custody and control of the state as follows:

> Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to *Estelle* [*v. Gamble*, 429 U.S. 97 (1976)] and *Youngberg* [*v. Romeo*, 457 U.S. 307 (1982)], that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents. *See Doe v. New York City Dept. of Social Services*, 649 F.2d 134, 141-142 (CA2 1981), *after remand*, 709 F.2d 782, *cert. denied sub nom Catholic Home Bureau v. Doe*, 464 U.S. 864 (1983); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 794-797 (CA11 1987) (*en banc*), *cert. pending* . . . . We express no view on the validity of this analogy, however, as it is not before us in the present case.

*DeShaney*, 489 U.S. at 201 n.9 (part of citations omitted).

Thus, because the Supreme Court declined to reach the issue, it can be argued that whether the state

and its agents have a duty under the Due Process Clause to protect involuntarily-placed foster children from harm was not "clearly established" when Kara and Mikaela were placed and maintained in foster care. However, public officers and employees cannot succeed on a qualified immunity defense simply because the Supreme Court has not had an opportunity to decide whether a person has a specific constitutional right. It is sufficient to deny the defense of qualified immunity if the course of the law should warn a public official or employee that his or her act or omission violates a person's constitutional rights. By 1989 and 1990, the decisions of the federal courts of appeals clearly established that the state had a constitutional obligation under the Due Process Clause to protect children over whom it had assumed custody of some form.

One commentator states: "In most cases, the [courts] have supported the protection of foster children on substantive due process grounds." Arlene E. Fried, *The Foster Child's Avenues of Redress: Questions Left Unanswered,* 26 COLUM. J.L. & SOC. PROBS. 465, 480 (1993). The *Ledbetter* court held that a foster child has a liberty interest in a safe environment, and failure to protect the child from an abusive foster parent violated the child's right to substantive due process. Fried, 26 COLUM. J.L. & SOC. PROBS. at 481 (citing *Ledbetter,* 818 F.2d at 797). The Seventh Circuit also held that a foster child has a substantive due process right to be protected from a foster parent the agency knows or should know is dangerous to the child's physical or mental health. *K.H. v. Morgan,* 914 F.2d 846, 848-49 (7th Cir. 1990).

While there are some surprising departures by the federal courts of appeals—*Milburn v. Anne Arundel*

*County Dep't of Social Servs.*, 871 F.2d 474 (4th Cir.), *cert. denied*, 493 U.S. 850 (1989)—the great majority of the federal circuit courts which have considered the question have concluded that foster children possess substantive due process rights to care and protection. Fried, 26 COLUM. J.L. & SOC. PROBS. at 485.

The responsibility of social workers to protect foster children has not been explicated solely by caselaw. The 1979 National Association of Social Workers Delegate Assembly adopted a Code of Ethics (revised by the 1990 and 1993 Assemblies) which "represents standards of ethical behavior for social workers in professional relationships with those served, with colleagues, with employers, with other individuals and professions, and with the community and society as a whole." Code of Ethics at v. The Code states that the social worker's primary responsibility is to clients. *Id.* at 5. The Code also states:

> 6. The social worker should provide clients with accurate and complete information regarding the extent and nature of the services available to them.
> 7. The social worker should apprise clients of their risks, rights, opportunities, and obligations associated with social service to them.

*Id.*

Robert Horowitz says that when the American Bar Association Center on Children and the Law surveyed child welfare liability in the early 1980's, it found relatively few cases. *Liability in Child Welfare and Protection Work: Risk Management Strategies*, ABA CENTER ON CHILDREN AND THE LAW (1991). However, the Children's Center states that when social services professionals are now asked about the incidence of litigation surrounding foster care, more and more

hands are being raised, reflecting an increase in potential liability for child welfare work. *Id*. at ix. In Chapter 1, *Defining the Risks after DeShaney*, Marsha Sprague states that, "[w]hile *DeShaney* has served to limit the liability of caseworkers, of child protective and child welfare agencies, and of private service providers in some respects, it does not affect most of the cases filed in this context." *Id*. at 18. In her endnotes, Sprague ranks the areas of risk of liability. Failure to adequately protect the child from harm in foster care ranks as "high." *Id*. at 27.

In view of all the attention given to this subject, it is impossible to conclude that the department and its social workers did not know that they were potentially liable under the Due Process Clause and § 1983 if they failed to adequately investigate the qualifications of foster care parents with whom they placed children or did not adequately supervise the foster care and promptly remove children when confronted with evidence of abuse.

Thus, the social workers who allegedly knew or should have known that Smit caused or permitted the abuse of children in her care are not entitled to the defense of qualified immunity. Relevant caselaw prior to the placement and supervision of Kara B. and Mikaela R. clearly established that reckless or deliberate indifference to the safety of foster care children violated their liberty interest under the Due Process Clause.

## FOSTER PARENT AS STATE ACTOR

The majority concludes that Smit was not a state actor. Section 1983 makes it a federal tort for a person to deprive another of his or her constitutional rights "under color of law." It has been held that, "[t]he care of

foster children is not traditionally the exclusive prerogative of the State." *Milburn*, 871 F.2d at 479. In *Milburn* , however, the child was placed in foster care voluntarily by the parent. The Western District Court of Michigan concluded that a foster parent was not a state actor because "[d]ay-to-day parenting decisions were left open to the judgment of the [foster parents]." *Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992), *aff'd*, 25 F.3d 304 (6th Cir.), *cert. denied*, 115 S. Ct. 485 (1994).

Treating foster parents as private actors is inconsistent with the historical development of the state-action doctrine. *See* Dee, 69 WASH. U. L.Q. 1201. It is also inconsistent with the need to closely supervise foster parent care because of the high incidence of abuse. Where a child is placed by the state in foster care, the acts of the foster parent can be said to be "fairly attributable" to the state. *See id.* at 1218.

Some courts have held that where the parent voluntarily places his or her child in foster care, the foster parent is not a state actor. I do not believe it should matter how the child comes into foster care. Martin Guggenheim, *The Effect of Tort Law on Child Welfare Liability*, in *Risk Management Strategies* at 86, states:

> It is true that the way in which a child enters the foster care system is significant from the parent's perspective, but that difference is immaterial from the perspective of the child. Once a child is in foster care, regardless of the method by which s/he entered the system, it is difficult to conclude that some children have federal rights which protect them against harm while others have no such federal rights.

*Quoted in* Fried, 26 COLUM. J.L. & SOC. PROBS. at 487 n.162.

## STATE-LAW CLAIMS

(a) *Cords v. Anderson.*

The majority concludes that § 893.80(4), STATS., immunizes the department and its social workers from tort liability under Wisconsin law for failing to remove the plaintiff children from foster care of a person they knew or should have known was exposing and subjecting the children to sexual abuse. The majority misconstrues § 893.80(4). The statute assumes that the governmental subdivision or its officer or employee makes a choice between reasonable alternatives. The statute protects the agency or officer whose reasonable choice turns out badly. In some situations, the agency or officer may not have a choice of action. For example, the park manager of a state-owned recreational area who knew that a publicly-used trail was inches away from a ninety-foot gorge in dangerous terrain did not have the choice of not posting signs warning users of the danger. *Cords v. Anderson*, 80 Wis. 2d 525, 541-42, 259 N.W.2d 672, 679-80 (1977). The park manager's duty to warn became ministerial.

It would be shocking to construe Wisconsin's immunity statute to shield from liability public agencies and officers who are deliberately indifferent to the lives and safety of the persons they govern. We have concluded that such conduct as to foster children is actionable under the Due Process Clause and § 1983. Are we so insensitive that we leave to Congress the protection of our children? I believe not.

(b) *Professional Discretion.*

The majority implies that the "medical discretion" cases—*Scarpaci v. Milwaukee County*, 96 Wis. 2d 663,

69

292 N.W.2d 816 (1980), *Protic v. Castle Co.*, 132 Wis. 2d 364, 392 N.W.2d 119 (Ct. App. 1986), *Gordon v. Milwaukee County*, 125 Wis. 2d 62, 370 N.W.2d 803 (Ct. App. 1985)—are anomalies. In *Stann v. Waukesha County*, 161 Wis. 2d 808, 818 & n.3, 468 N.W.2d 775, 779 (Ct. App. 1991), we confined the cited cases to their facts. This was not necessary. However, we should have explained that a public officer or employee who practices a profession must meet the standards of care and conduct required by his or her profession. The supreme court made that clear in *Scarpaci*. In that case, the court held that while the county medical examiner's decision to conduct an autopsy was "governmental" and subject to § 893.80(4), STATS., how the examiner performed the autopsy involved "professional" discretion to which the standard of care required of medical examiners applied. 96 Wis. 2d at 685-88, 292 N.W.2d at 826-28. In other words, the medical examiner's performance of an autopsy was to be tested according to the standards of his profession.

Social work is no different from the practice of medicine in this respect; there are standards of care to which a social worker must conform, just as there are standards of care to which a doctor must conform. "Social work is among the most demanding professions." Robert H. Cohen, J.D., A.C.S.W., General Counsel, National Association of Social Workers, *Foreword* to FREDERIC G. REAMER, SOCIAL WORK MALPRACTICE AND LIABILITY: STRATEGIES FOR PREVENTION xi (1994). "Malpractice in social work usually is the result of a practitioner's active violation of a client's rights (in legal terms, *acts of commission, misfeasance, or malfeasance*) or a practitioner's failure to perform certain duties (*acts of omission or nonfeasance*)." *Id.* at 3; *see also* SOCIAL WORK MALPRACTICE at 107 ("[S]ocial work-

ers are in a special position to abuse substantive rights of their particularly vulnerable clientele.").

Government-employed social workers take pride in their work and consider themselves professionals. The discretion they exercise is not ordinarily governmental but professional. That discretion must be exercised according to the standards of the social work profession, whether the social worker is privately or publicly employed. Section 893.80(4), STATS., does not immunize a professional from actions which do not meet professional standards.

Whether the defendant social workers met professional standards in placing and maintaining Kara B. and Mikaela R. in the foster care of Roxanne Smit cannot be decided by affidavits; a trial is necessary.

For these reasons, I concur in part and dissent in part.